945 So.2d 1246 (2006)
Howard A. ENGLE, M.D., et al., Petitioners,
v.
LIGGETT GROUP, INC., et al., Respondents.
No. SC03-1856.
Supreme Court of Florida.
December 21, 2006.
*1253 Stanley M. Rosenblatt and Susan Rosenblatt of Stanley M. Rosenblatt, P.A., Miami, Florida, for Petitioners.
Alvin Bruce Davis of Steel, Hector and Davis, P.A., Miami, Florida, Mercer K. Clarke and Kelly A. Luther of Clarke, Silverglate, Campbell, Williams and Montgomery, Miami, Florida, Marc E. Kasowitz, Daniel R. Benson and Aaron H. Marks of Kasowitz, Benson, Torres and Friedman, LLP, New York, New York, Elliott H. Scherker, Arthur J. England, Jr., and David L. Ross of Greenberg Traugrig, P.A., Miami, Florida, Norman A. Coll and Kenneth J. Reilly of Shook, Hardy and Bacon, LLP, Miami, Florida, Stephen N. Zack of Zack, Sparber, Kosnitzky, Spratt and Brooks, P.A., Miami, Florida, Benjamine Reid and Wendy F. Lumish of Carlton Fields, P.A., Miami, Florida, Anthony N. Upshaw of Adorno and Yoss, P.A., Miami, Florida, Renaldy J. Gutierrez and Kathleen M. Sales of Gutierrez and Associates, Miami, Florida, Dan K. Webb and Stuart Altschuler of Winston and Strawn, LLP, Chicago, Illinois, Robert H. Klonoff of Jones Day, Washington, D.C., Robert C. Heim and Joseph Patrick Archie of Dechert, LLP, Philadelphia, Pennsylvania, James R. Johnson and Diane P. Flannery of Jones Day, Atlanta, Georgia, and Richard A. Schneider of King and Spalding, LLP, Atlanta, Georgia, Joseph P. Moodhe of Debevoise and Plimpton, New York, New York, James T. Newsom of Shook, Hardy and Bacon, LLP, Kansas City, Missouri, for Respondents.
Norwood S. Wilner of Spohrer, Wilner, Maxwell and Matthews, P.A., Jacksonville, Florida on behalf of Tobacco Trial Lawyers Association; Theodore Jon Leopold of RicciLeopold, P.A., Palm Beach Gardens, Florida, Richard Frankel, Matthew L. Myers, and Michael Stroud, Washington, D.C. on behalf of Trial Lawyers for Public Justice and Public Citizen, the Campaign for Tobacco-Free Kids, and the American Cancer Society; Stephen P. Teret and Jon S. Vernick, Center for Law and the Public's Health, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland, and John B. Ostrow, Miami, Florida on behalf of American Public Health Association, American Medical Association, American Academy of Pediatrics, American Heart Association, American Lung Association, American Legacy Foundation and Roswell Park Cancer Institute, Sylvester Comprehensive Cancer Center/University of Miami Hospital and Clinics and the Women's Cancer League of Greater Miami; Phillip Timothy Howard of Howard and Associates, P.A., Tallahassee, Florida, Douglas Blanke, Executive Director, William Mitchell College of Law, Saint Paul, Minnesota, Richard A. Daynard, Ph.D., Robert L. Kline and Christopher Banthin, Northeastern University School of Law, Boston, Massachusetts on behalf of Tobacco Control Legal Consortium and Tobacco Control Resource Center; Roy C. Young of Young Van Assenderp, Tallahassee, Florida, John H. Beisner, John F. Niblock and Jessica Davidson Miller of O'Melveny and Myers, LLP, Washington, D.C., and Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, D.C., on behalf of the Chamber of Commerce of the United States; Rebecca O'Dell Townsend of Haas, Dutton, Blackburn, Lewis and Longley, P.L., Tampa, Florida, Daniel J. Popeo and David Price, Washington, D.C., on behalf of Washington Legal Foundation and National Association of Manufacturers, for Amici Curiae.
*1254 PER CURIAM.
This case arises from the Third District Court of Appeal's reversal of a final judgment entered in a smokers' class action lawsuit that sought damages against cigarette companies and industry organizations for alleged smoking-related injuries. See Liggett Group, Inc. v. Engle, 853 So.2d 434 (Fla. 3d DCA 2003) (hereinafter "Engle II"). The final judgment awarded $12.7 million in compensatory damages to three individual plaintiffs and $145 billion in punitive damages to the entire class. See id. at 441. We have jurisdiction because Engle II misapplies our decision in Young v. Miami Beach Improvement Co., 46 So.2d 26 (Fla.1950). See art. V, § 3(b)(3), Fla. Const.
For the reasons explained more fully in this opinion, although we approve the Third District's reversal of the $145 billion class action punitive damages award, we quash the remainder of the Third District's decision. A majority of the Court (Anstead, Pariente, Lewis and Quince) holds that the compensatory damages award in favor of Mary Farnan in the amount of $2,850,000 and Angie Della Vecchia in the amount of $4,023,000 should be reinstated. However, the court unanimously agrees that the compensatory damages award in favor of Frank Amodeo must be vacated based on the statute of limitations.
Further, a majority of the Court (Anstead, Pariente, Lewis and Quince) concludes that Engle II misapplied our decision on the law of the case doctrine in Florida Department of Transportation v. Juliano, 801 So.2d 101, 106 (Fla.2001); that the certification of the class action and the Phase I trial process were not abuses of the trial court's discretion; and that certain common liability findings can stand. However, we also conclude that the remaining issues, including individual causation and apportionment of fault among the defendants, are highly individualized and do not lend themselves to class action treatment. Thus, we remand with directions that the class should be decertified without prejudice to the class members filing individual claims within one year of the issuance of our mandate in this case with res judicata effect given to certain Phase I findings.
More specifically, we hold as follows:
PUNITIVE DAMAGES: We unanimously hold that the Third District erred in concluding that under Young the class action punitive damages claims were barred by the settlement agreement between the State of Florida and many of the defendants involved in the present action (Florida Settlement Agreement or FSA). However, we vacate the punitive damages award because we unanimously conclude that the punitive damages award is excessive as a matter of law.
A majority of the Court (Anstead, Pariente, Lewis, and Quince) also concludes that the Third District misapplied Ault v. Lohr, 538 So.2d 454, 456 (Fla.1989), by holding that compensatory damages must be determined before a jury can consider entitlement to punitive damages. Although Justices Lewis and Quince would allow the finding of entitlement to punitive damages to stand, a different majority of the Court (Wells, Anstead, Pariente, and Bell) concludes that the trial court erred in allowing the jury to make this finding during Phase I because, consistent with Ault, proof of liability, which includes both reliance and causation, is a predicate to the determination of entitlement to punitive damages.
PHASE I FINDINGS: A majority of the Court (Anstead, Pariente, Lewis, and Quince) concludes that the Third District erred as a matter of law in conducting a *1255 plenary review of the trial court's decision to certify the Engle Class after completion of an extended Phase I trial and after a different panel of the Third District upheld the certification.[1] This same majority concludes that it was proper to allow the jury to make findings in Phase I on Questions 1 (general causation), 2 (addiction of cigarettes), 3 (strict liability), 4(a) (fraud by concealment), 5(a) (civil-conspiracy-concealment), 6 (breach of implied warranty), 7 (breach of express warranty), and 8 (negligence). Therefore, these findings in favor of the Engle Class can stand. The Court unanimously agrees that the nonspecific findings in favor of the plaintiffs on Questions 4 (fraud and misrepresentation) and 9 (intentional infliction of emotional distress) are inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause. Therefore, these findings cannot stand. Because the finding in favor of the plaintiffs on Question 5 (civil conspiracy-misrepresentation) relies on the underlying tort of misrepresentation, this finding also cannot stand.
ARGUMENTS OF ENGLE CLASS'S COUNSEL: A majority of the Court (Anstead, Pariente, Lewis, and Quince) disagrees with the Third District's conclusion that the plaintiffs' counsel's improper arguments require reversal, but we condemn in no uncertain terms some of these arguments. We do not address the Phase II arguments because we are reversing the punitive damages award from Phase II-B and the defendants do not raise any error with respect to arguments made during Phase II-A, in which the jury determined the individual compensatory damages of three class representatives.
CLASS CERTIFICATION CUT-OFF DATE: While a majority (Anstead, Pariente, Lewis, and Quince) agrees that the class cannot be open-ended, we disagree with the Third District's ruling that the appropriate cut-off date for class membership is October 31, 1994, the date the class was initially certified. We conclude that the date of the trial court's November 21, 1996, order that recertified a narrower class is the appropriate cut-off date.
JUDGMENT FOR CLASS MEMBERS: Because Mary Farnan, who was diagnosed with lung cancer in April 1996, is clearly a proper member of the class, the Third District erred in reversing the compensatory verdict in favor of Farnan in the amount of $2,850,000, except as against Liggett Group Inc. and Brooke Group Holding Inc., whom the jury found to be zero percent at fault. We thus approve the Third District's conclusion that a directed verdict should be granted in favor of Liggett and Brooke.
As for Angie Della Vecchia, she was diagnosed with lung cancer in early 1997. However, at that time, it was also noted by her doctors that she had a past medical history of chronic obstructive pulmonary disease ("COPD") and significant hypertension. Because two of the diseases at issue in this case are coronary heart disease and COPD, Della Vecchia's medical records indicate that she had been suffering from a tobacco related disease prior to the time of certification and is therefore properly included as a class member. The jury specifically found that her lung disease was caused by smoking. Thus, a majority of the Court concludes that the compensatory judgment in favor of Della Vecchia in the amount of $4,023,000 should stand, except as against Liggett and *1256 Brooke, who were found to be zero percent at fault.[2] The Court unanimously agrees with the Third District that the final judgment in favor of class representative Frank Amodeo must be reversed because all of Amodeo's claims are barred by the statute of limitations.
With the summary of this Court's holdings set forth above, we now turn to a more in-depth discussion of the background of this case and the salient issues.

FACTS AND PROCEDURAL HISTORY
On October 31, 1994, the trial court certified as a nationwide class action a group of smokers and their survivors under Florida Rule of Civil Procedure 1.220(b)(3). The class representatives on behalf of themselves, and all others similarly situated, filed an amended class action complaint seeking compensatory and punitive damages against major domestic cigarette companies and two industry organizations (hereinafter collectively referred to as "Tobacco") for injuries allegedly caused by smoking.[3]
The trial court defined the class as: "All United States citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Tobacco filed an interlocutory appeal of the trial court's order certifying the Engle Class pursuant to Florida Rule of Appellate Procedure 9.130(a)(6). See R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39, 40 (Fla. 3d DCA 1996) (hereinafter "Engle I"). On January 31, 1996, the Third District affirmed the trial court's order certifying the class but reduced the class to include only Florida smokers. See id. at 42 (striking "[a]ll United States citizens and residents" provision and substituting in its place "[a]ll Florida citizens and residents"). Tobacco's petition for review by this Court was denied. See R.J. Reynolds Tobacco Co. v. Engle, 682 So.2d 1100 (Fla.1996).
On February 4, 1998, the trial court issued a trial plan, dividing the trial proceedings into three phases. Phase I consisted of a year-long trial to consider the issues of liability and entitlement to punitive damages for the class as a whole. See Engle II, 853 So.2d at 441. The jury considered common issues relating exclusively to the defendants' conduct and the general health effects of smoking. See id. On July 7, 1999, at the conclusion of Phase I, the jury rendered a verdict for the Engle Class and against Tobacco on all *1257 counts.[4]
Phase II was divided into two subpartsPhase II-A and Phase II-B. Phase II-A was intended to resolve the issues of entitlement and amount of compensatory damages, if any, that the three individual class representativesFrank Amodeo, Mary Farnan, and Angie Della Vecchia should receive. Phase II-B was designed to result in a jury determination of a total lump sum punitive damage award, if any, that should be assessed in favor of the class as a whole.
At the conclusion of Phase II-A, the jury determined that the three individual class representatives were entitled to compensatory damages in varying amounts, which were offset by their comparative fault. The total award was $12.7 million. The jury subsequently determined in Phase II-B the lump-sum amount of punitive damages for the entire class to be $145 billion, without allocation of that amount to any class member. Tobacco filed several post-verdict motions, including a motion at the conclusion of phase II-B for a new trial or remittitur, a motion to set aside the verdict, and for entry of judgment, and another motion to decertify the class. See Engle v. R.J. Reynolds Tobacco, No. 94-08273 CA-22 (Fla. 11th Cir.Ct. Nov. 6, 2000) (hereinafter "Engle F.J."), rev'd, 853 So.2d 434 (Fla. 3d DCA 2003).
On November 6, 2000, the trial court entered a final judgment and amended omnibus order, in which it granted judgment in Tobacco's favor in two respects. First, the trial court granted Tobacco's motion for directed verdict on a statute of limitations basis with regard to named plaintiff Frank Amodeo on the counts based on strict liability, implied warranty, express warranty, negligence, and intentional infliction of emotional distress. However, the trial court ruled that Amodeo's fraud and conspiracy claims were not time-barred. Second, the court granted Tobacco's motion for directed verdict with regard to count seven of the complaint, in which the Engle Class sought equitable relief, upon the basis that the count had previously been dismissed by the court. The court entered judgment in favor of the Engle Class on all other counts, ordered immediate payment to the individual plaintiffs, and directed Tobacco to pay the $145 billion in punitive damages into the registry of the Dade County Circuit Court for the benefit of the entire class.
*1258 According to the trial plan, in Phase III, new juries are to decide the individual liability and compensatory damages claims for each class member (estimated to number approximately 700,000). See Engle II, 853 So.2d at 442. Thereafter, the plan contemplated that the trial court would divide the punitive damages previously determined equally among any successful class members. Pursuant to the omnibus order, interest on the punitive award began accruing immediately. See id.
Tobacco filed an appeal and the Third District reversed the final judgment with instructions that the class be decertified. See id.

ANALYSIS
1. Res Judicata

A. History of the Florida Settlement Agreement and the Master Settlement Agreement
In 1995, the State of Florida and others (hereinafter "State") filed a complaint against many of the defendants involved in the present action (hereinafter "FSA Defendants").[5] This earlier action was initiated by the State under the Medicaid Third-Party Liability Act, section 409.910, Florida Statutes (1995). In its complaint, the State alleged counts of negligence, strict liability in tort, injunctive relief, various statutory and criminal violations, and violations of the Florida RICO Act. The State sought reimbursement of Medicaid monies expended in treating the victims of tobacco-related illnesses as well as other damages permitted by law, including punitive damages where available. Subsequent to the filing of the State's complaint, the circuit court granted the FSA Defendants' motion for summary judgment and dismissed all claims by the State for punitive damages with the exception of its claim for punitive damages contained in count four of the complaint alleging only statutory and criminal violations.[6]
In 1997, the State and the FSA Defendants entered into the Florida Settlement Agreement, which resolved "all present and future civil claims against all parties to [the] litigation relating to the subject matter of [the] litigation, which [were] or could have been asserted by any of the parties [thereto]." (Emphasis supplied.) Pursuant to the terms of the FSA, in exchange for agreeing to resolve these claims, the State received $550 million for unspecified purposes, $200 million for a pilot program by the State of Florida aimed at the reduction of the use of tobacco products by minors, several billion dollars paid out over a period of time for the benefit of the State of Florida, and injunctive relief. As stated by the FSA, the *1259 monies received "constitute[d] not only reimbursement for Medicaid expenses incurred by the State of Florida, but also settlement of all of Florida's other claims, including those for punitive damages, RICO and other statutory theories." Also included in the FSA was a "Non-Admissibility" provision which provided:
These settlement negotiations have been undertaken by the parties in good faith and for settlement purposes only, and neither this Settlement Agreement nor any evidence of negotiations hereunder, shall be offered or received in evidence in this Action, or any other action or proceeding, for any purpose other than in an action or proceeding arising under this Settlement Agreement.
During the time period in which Florida pursued an action against the FSA Defendants, several other states also initiated actions against the FSA Defendants for similar if not identical claims. These states settled their claims against the FSA Defendants in November of 1998 when all parties to that action entered into a Master Settlement Agreement (the "MSA"). The MSA released all claims of the participating states and also included a "Non-Admissibility" provision similar to that in the FSA. Under the MSA, the FSA Defendants are required to pay certain participating states more than $200 billion over the first twenty-five years, with additional amounts to be paid in perpetuity after that.

B. Res Judicata Effect of the FSA
The Third District in this case held that the punitive damages claims of the Engle Class were precluded by the FSA. See Engle II, 853 So.2d at 467. The district court reasoned that Florida, in agreeing to relinquish its claims through the FSA, had effectively resolved a matter of general interest to all of its citizens and, therefore, the FSA was binding upon all citizens even though they were not parties to the original litigation. See id. at 468. The district court therefore concluded that the FSA's "release, and the res judicata effect of the resulting final judgment, preclude[d] the [Engle Class's] punitive-damage claims here." Id.
We agree with the Third District that whether the application of res judicata was proper is a question of law. See id. at 468. We therefore apply a de novo standard of review. See D'Angelo v. Fitzmaurice, 863 So.2d 311, 314 (Fla.2003) (stating that standard of review for pure questions of law is de novo).
The doctrine of res judicata serves an important purpose in the judicial system of this state. The foundation of res judicata is that a final judgment in a court of competent jurisdiction is absolute and settles all issues actually litigated in a proceeding as well as those issues that could have been litigated. We have explained the doctrine of res judicata as follows:
A judgment on the merits rendered in a former suit between the same parties or their privies, upon the same cause of action, by a court of competent jurisdiction, is conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other matter which might with propriety have been litigated and determined in that action.
Fla. Dep't of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001) (alteration in original) (quoting Kimbrell v. Paige, 448 So.2d 1009, 1012 (Fla.1984)).
In Young, this Court held that citizens of the City of Miami Beach were bound by a judgment against the city that enjoined the city from asserting any interest in a particular parcel of oceanfront property. See 46 So.2d at 30. An association of *1260 citizens of the City of Miami Beach filed an action to determine the public's interest in this parcel, which was owned by the defendant, a private corporation. See id. at 26. In holding that the claim was barred by the prior decree enjoining the City, we noted that a "judgment against a municipal corporation in a matter of general interest to all its citizens is binding on the latter, although they are not parties to the suit." Id. at 30 (emphasis supplied) (quoting 38 Am.Jur. § 728).
Similarly, in Castro v. Sun Bank of Bal Harbour, 370 So.2d 392, 393 (Fla. 3d DCA 1979), the Third District held that private parties were precluded from relitigating public nuisance and zoning violation claims that had already been settled by the State. The district court reasoned that the plaintiffs were bound by the final judgment of the prior action "irrespective of whether they were formal parties to the . . . action" because they were "citizens of the State of Florida and the City of Miami at the time of the [prior] litigation." Id.
The district court, as well as Tobacco, relied on Young and Castro to support the position that the FSA is binding on all citizens of the State of Florida. However, in both of these cases the governmental entity was asserting interests of concern common to all of its citizens: the public's interest in oceanfront property and public nuisance and zoning violations. Application of res judicata in these contexts is supported by precedent that has established that for a State to bind its citizens as a result of litigation advanced by the State, the government must be suing in its parens patriae capacity, litigating the rights or interests common to the public at large and thereby representing the citizenry of the State. See Satsky v. Paramount Commc'ns, Inc., 7 F.3d 1464, 1470 (10th Cir.1993). The Eleventh Circuit Court of Appeals appropriately described this form of action when it stated:
"In order to maintain [a parens patriae] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez, 458 U.S. 592, 607, 102 S.Ct. 3260, 3268, 73 L.Ed.2d 995 (1982). "Parens patriae standing has been explained on the ground that the plaintiff state is not merely advancing the rights of individual injured citizens, but has an additional sovereign or quasi-sovereign interest." 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4047 at 223 (1988). Although the Supreme Court has not expressly defined what is a "quasi-sovereign" interest, it is clear that a state may sue to protect its citizens against "the pollution of the air over its territory; or of interstate waters in which the state has rights." 12 Moore's Federal Practice ¶ 350.02[3] at 3-20 (1993). It is equally clear, however, that a state may not sue to assert the rights of private individuals. See Alfred L. Snapp, 458 U.S. at 600, 102 S.Ct. at 3265; Pennsylvania v. New Jersey, 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976); New York by Abrams v. Seneci, 817 F.2d 1015, 1017 (2nd Cir.1987); Illinois v. Life of Mid-America Ins. Co., 805 F.2d 763, 766 (7th Cir.1986), 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3531.11 at 19 (1984).
Id. at 1469 (alteration in original).
In Satsky, the court analyzed an action in which a group of property owners alleged a variety of private property claims *1261 arising from the defendant's operation of a mine. See id. at 1466. The defendant claimed that a consent decree between itself and the State of Colorado precluded the plaintiffs' claims. See id. at 1467. In reversing a final summary judgment entered by the lower court for the defendant, the court held that "[t]o the extent [the] claims involve injuries to purely private interests, which the State cannot raise, then the claims are not barred." Id. at 1470. We agree with the reasoning of Satsky and with the principle that "litigation by a government agency will not preclude a private party from vindicating a wrong that arises from related facts but generates a distinct individual cause of action." Southwest Airlines Co. v. Texas Intern. Airlines, Inc., 546 F.2d 84, 98 (5th Cir.1977).
In the litigation that resulted in the FSA, the State, in support of its claim for punitive damages, alleged knowing and intentional dissemination of false, fraudulent and misleading statements to the general public by the FSA Defendants in violation of section 817.41, Florida Statutes (1995).[7] In the present case, the Engle Class relied on legal theories that were based on injuries personal to the class members to support the claim for punitive damages. Since the State had no right to pursue these types of private interests on behalf of its citizens, the punitive damages claims settled by the State in the FSA, if any, were distinct from the punitive damages sought by the Engle Class in the present case.
The reasoning in In re Exxon Valdez, 270 F.3d 1215 (9th Cir.2001), is instructive. In that case, the defendants appealed a punitive damages award for claims arising out of the Exxon Valdez oil spill. See id. at 1221. The plaintiffs consisted of separate classes of commercial fishermen, Alaskan natives, and landowners affected by the spill. See id. at 1225. These distinct classes sought compensatory and punitive damages for injuries resulting from the Exxon Valdez spill. See id. The jury returned a verdict in favor of the plaintiffs which assessed $287 million in compensatory damages and $5 billion in punitive damages. See id. Exxon appealed the resulting judgment, asserting that the punitive damages award was barred by the res judicata effect of a consent decree between Exxon and the United States and the State of Alaska that settled claims in a previous action filed under the Clean Water Act. See id. at 1227. In holding that the award was not barred by the previous settlement, the court concluded that the interests asserted by the plaintiffs were distinct from those asserted by the United States and Alaska in the prior action. See id. at 1228. The court, relying on Satsky, noted that the prior consent decree addressed harms caused to the environment and the general public whereas the claims in the class action were to vindicate wrongs that resulted in individual injuries. See In re Exxon Valdez, 270 F.3d at 1227-28. Moreover, the court stressed that although the consent decree "released all government claims, [it] provides explicitly that `nothing in this agreement, however, is intended to affect legally the claims, if any, of any person or entity not a Party to this Agreement.'" Id. at 1227. The FSA expressly provided that neither the agreement itself "nor any evidence of negotiations [t]hereunder, shall be offered or received in evidence in this Action, or any other action or proceeding, for any purpose other than in *1262 an action or proceeding arising under this Settlement Agreement." The facts of In re Exxon are similar to the circumstances presented in this case and support our conclusion that the Third District erred in holding that the FSA barred the Engle Class's punitive damages claim.
2. Punitive Damages Award
Although we conclude that the Third District erred in applying the doctrine of res judicata to bar the Engle Class's punitive damages claim, we must vacate the classwide punitive damages award because we unanimously agree with the Third District that the trial court erred in allowing the jury to determine a lump sum amount before it determined the amount of total compensatory damages for the class. As a matter of law, the punitive damages award violates due process because there is no way to evaluate the reasonableness of the punitive damages award without the amount of compensatory damages having been fixed. The amount awarded is also clearly excessive because it would bankrupt some of the defendants. A majority of the Court further concludes that the trial court erred in allowing the jury to consider entitlement to punitive damages during the Phase I trial. We address these issues separately.

A. Phase I Finding on Entitlement to Punitive Damages
The last question on the Phase I verdict form asked the jury to determine whether "[u]nder the circumstances of this case, . . . the conduct of any Defendant rose to a level that would permit a potential award or entitlement to punitive damages." The jury answered "yes" with respect to each of the defendants. In Phase II-B, the jury awarded a total of $145 billion in punitive damages to the class.
The Third District ruled that the trial erred in awarding classwide punitive damages "without the necessary findings of liability and compensatory damages." Engle II, 853 So.2d at 450. A majority of the Court (Anstead, Pariente, Lewis, and Quince) concludes that an award of compensatory damages is not a prerequisite to a finding of entitlement to punitive damages. Compensatory and punitive damages serve distinct purposes. As the United States Supreme Court has explained:
The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. The latter, which have been described as "quasi-criminal," operate as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation.
Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citations omitted).
Because a finding of entitlement to punitive damages is not dependent on a finding that a plaintiff suffered a specific injury, an award of compensatory damages need not precede a determination of entitlement to punitive damages. Therefore, we conclude that the order of these determinations is not critical. See Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 474 (5th Cir.1986).
A different majority of the Court (Wells, Anstead, Pariente, and Bell) concludes that under our decision in Ault v. Lohr, 538 So.2d 454, 456 (Fla.1989), a finding of liability is required before entitlement to punitive damages can be determined, and that liability is more than a breach of duty. A finding of liability necessarily precedes a determination of *1263 damages, but does not compel a compensatory award. For example, in Ault, the jury found that the defendant had committed an assault and battery but awarded $0 in compensatory damages and $5000 in punitive damages. See id. at 455. Thus, unlike the Phase I jury in this case, the jury in Ault found that the plaintiff had proved the underlying cause of action but did not suffer any compensable damage.
Although we appeared to use "breach of duty" and "liability" interchangeably in Ault, the Court expressly adopted the principles set forth in dicta in Lassiter v. International Union of Operating Engineers, 349 So.2d 622 (Fla.1976). Specifically, we stated that
[n]ominal damages are awarded to vindicate an invasion of one's legal rights where, although no physical or financial injury has been inflicted, the underlying cause of action has been proved to the satisfaction of a jury. Accordingly, the establishment of liability for a breach of duty will support an otherwise valid punitive damage award even in the absence of financial loss for which compensatory damages would be appropriate.

Ault, 538 So.2d at 455 (some emphasis supplied) (quoting Lassiter, 349 So.2d at 625-26).
In this case, the Phase I verdict did not constitute a "finding of liability" under Ault. This is evidenced by the fact that had the jury found for Tobacco on the legal cause and reliance issues during Phase II, there would have been no opportunity for the jury to award the named plaintiffs damages of any type. In other words, Phase II findings for Tobacco on legal causation and reliance would have precluded the jury from awarding compensatory or punitive damages. It was error for the trial court to allow the jury to consider entitlement to punitive damages before the jury found that the plaintiffs had established causation and reliance.
In Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class members relied on Tobacco's misrepresentations or were injured by Tobacco's conduct. As the Third District noted, the Phase I jury "did not determine whether the defendants were liable to anyone." Engle II, 853 So.2d at 450. It was therefore error for the Phase I jury to consider whether Tobacco was liable for punitive damages.

B. Excessiveness
Even if it were not error to determine entitlement to punitive damages in Phase I, it was clear error to allow the jury to go beyond mere entitlement and award classwide punitive damages when total compensatory damages had not been determined. Under Florida law, a trial court's determination of whether a damage award is excessive, requiring a remittitur or a new trial, is reviewed by an appellate court under an abuse of discretion standard. See St. John v. Coisman, 799 So.2d 1110, 1114 (Fla. 5th DCA 2001). However, a trial court's determination as to whether a punitive damage award exceeds the boundaries of due process as guaranteed by the Unites States Constitution is reviewed by a court under a de novo standard. See Cooper Indus., 532 U.S. at 436, 121 S.Ct. 1678.
Florida law requires that an appellate court review a punitive damages award to make certain that the manifest weight of the evidence does not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct. See Arab Termite & Pest Control of Fla., Inc. v. Jenkins, 409 So.2d 1039, 1043 (Fla.1982). Additionally, an award must be reviewed to ensure that it bears some *1264 relationship to the defendant's ability to pay and does not result in economic castigation or bankruptcy of the defendant. See Bould v. Touchette, 349 So.2d 1181, 1186 (Fla.1977).
In the past, we have not discussed whether punitive damages awards must bear some reasonable relation to compensatory damages. See Lassiter v. Int'l Union of Operating Eng'rs, 349 So.2d 622, 626 (Fla.1977); see also Ault, 538 So.2d at 456; Bankers Multiple Line Ins. Co. v. Farish, 464 So.2d 530, 533 (Fla.1985); Arab Termite, 409 So.2d at 1043. For example in Arab Termite, we stated that punitive damages "are to be measured by the enormity of the offense, entirely aside from the measure of compensation for the injured plaintiff." 409 So.2d at 1043. However, we now hold, consistent with United States Supreme Court decisions after Ault that recognize due process limits on punitive damages, that a review of the punitive damages award includes an evaluation of the punitive and compensatory amounts awarded to ensure a reasonable relationship between the two.
The United States Supreme Court has stated that a review of a punitive damages award must include consideration of three guideposts to determine whether the award is unconstitutionally excessive:
(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.
State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).
The second guidepost is determinative in this case. As the United States Supreme Court has explained regarding this second factor:
[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. Gore, 517 U.S., at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award"); TXO [Production Corp. v. Alliance Resources Corp., 509 U.S.] at 458[, 113 S.Ct. 2711]. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [Pacific Mutual Life Insurance Co. v.] Haslip, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23-24[, 111 S.Ct. 1032]. We cited that 4-to-1 ratio again in Gore. 517 U.S., at 581[, 116 S.Ct. 1589]. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. Id., at 581, and n. 33[, 116 S.Ct. 1589]. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving *1265 the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, id., at 582[, 116 S.Ct. 1589], or, in this case, of 145 to 1.
Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." Ibid.; see also ibid. (positing that a higher ratio might be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.
In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.
Campbell, 538 U.S. at 424-26, 123 S.Ct. 1513. Thus, the amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awardable, if any, so that the relationship between the two may be reviewed for reasonableness.
In this case, the district court stated that without having total compensatory damages determined it would be "impossible to determine whether punitive damages bear a `reasonable' relationship to the actual harm inflicted on the plaintiff." Engle II, 853 So.2d at 451. We agree. The trial plan allowed a lump sum determination of punitive damages for the entire class when compensatory damages had been determined only for the three individual class representatives. This approach does not provide a reviewing court with an adequate starting point to compare the lump sum punitive damages amount to compensatory damages to ensure there is some reasonable relationship. Accordingly, even if there was no error in allowing the Phase I jury to find entitlement to punitive damages, the classwide punitive damages award must be reversed.[8]
3. Law of the CaseClass Certification
In concluding that the Engle Class must be decertified, the Third District in Engle II ruled that the "`predominance' or `commonality' requirement is not satisfied, where claims involve factual determinations unique to each plaintiff." 853 So.2d at 445. The district court explained that "common questions" did not predominate over individual issues because the choice of law analysis would require examination of numerous different state laws governing different individual claims. See id. at 449. The court also concluded that class representation would not be "superior" to individual suits because: (1) individualized issues of liability, affirmative defenses, and damages outweighed any common issues in *1266 the case; (2) each class member had unique and different experiences, which would necessitate litigation of substantially separate issues, including legal causation, specific medical causation, reliance, and awareness of risks; and (3) individualized choice of law issues would cause class proceedings to be unmanageable. See id. at 445-47.
We conclude that the Third District erred in nullifying its previous affirmance of the trial court's certification order. Contrary to the Third District's conclusion, Florida Rule of Civil Procedure 1.220(d)(1) did not authorize the subsequent (and different) panel of appellate judges to simply substitute its judgment for that of the prior panel and reverse the trial court's certification order after the trial court entered its final judgment after Phase II. See Engle II, 853 So.2d at 443 n. 4.
A class is normally certified at an early stage of the proceedings, certainly before trial, and typically before discovery is completed. Rule 1.220(d)(1) provides an avenue for reexamining certification if subsequent discovery shows that circumstances have changed. See Int'l Longshoremen's Ass'n, Deep Sea Local 1408 v. Fisher, 860 So.2d 1078, 1078 (Fla. 1st DCA 2003) (affirming the trial court's nonfinal order certifying a class but noting that "because the order is interlocutory, it may be revisited by the trial court should circumstances change"). Rule 1.220(d)(1) was not designed to allow a district court to decertify a class, contrary to its previous affirmance of class certification and after notice to thousands of Floridians, a two-year trial, and an entry of final judgment.
Moreover, under the doctrine of law of the case, the Third District would have been justified in reversing its previous ruling in Engle I only if it concluded that the prior ruling would have resulted in a clear manifest injustice. See Juliano, 801 So.2d at 106 ("[A]n appellate court has the power to reconsider and correct an erroneous ruling that has become the law of the case where a prior ruling would result in a `manifest injustice.'") (quoting Strazzulla v. Hendrick, 177 So.2d 1, 4 (Fla.1965)).
Law of the case "requires that questions of law actually decided on appeal must govern the case in the same court and the trial court, through all subsequent stages of the proceedings." Juliano, 801 So.2d at 105. The Third District recently reiterated the purpose of the law of the case doctrine in a decision holding that the doctrine precluded relitigation of the propriety of class action treatment: "[P]oints of law adjudicated in a prior appeal are binding in order to promote stability of judicial decisions and to avoid piecemeal litigation." State, Dep't of Revenue v. Bridger, 935 So.2d 536, 538, 539 (Fla. 3d DCA 2006) (quoting Bueno v. Bueno de Khawly, 677 So.2d 3, 4 (Fla. 3d DCA 1996)).
The law of the case applies in subsequent proceedings as long as there has been no change in the facts on which the mandate was based. Specifically, we have recognized that
an appellate court should reconsider a point of law previously decided on a former appeal only as a matter of grace, and not as a matter of right; and that an exception to the general rule binding the parties to "the law of the case" at the retrial and at all subsequent proceedings should not be made except in unusual circumstances and for the most cogent reasonsand always, of course, only where "manifest injustice" will result from a strict and rigid adherence to the rule.
Strazzulla v. Hendrick, 177 So.2d 1, 4 (Fla.1965). We have also cautioned that *1267 "the exception to the rule should never be allowed when it would amount to nothing more than a second appeal on a question determined on the first appeal." Id. (emphasis supplied).
We conclude that no circumstances existed that justified the subsequent panel's reconsideration of the prior Third District decision approving class certification, which all parties and the trial court relied on to govern the continuation of the class action. On this issue, the analysis of the Engle II court was flawed in several respects. First, the Engle II court ignored the trial court's pretrial ruling that only Florida law would apply when it stated that the "choice-of-law analysis in the present case will require examination of numerous significantly different state laws governing the different plaintiffs' claims." Engle II, 853 So.2d at 449. Second, none of the cases from other jurisdictions cited by the Third District in Engle II to justify decertification was in the procedural posture of the present case.[9]
This case came before the Third District in Engle II after it had affirmed the class certification and after the conclusion of a trial on all common issues. Thus, there is no need to engage in an abstract analysis of the propriety of separate proceedings on common limited liability issues. Invalidating the completed class action proceedings on manageability and superiority grounds after a trial has occurred does not accord with common sense or logic.
Of course, this Court is not bound by the Third District's law of the case. See Juliano, 801 So.2d at 105 ("The doctrine of the law of the case requires that questions of law actually decided on appeal must govern the case in the same court and the trial court, through all subsequent stages of the proceedings."). Nevertheless, we conclude that the trial court did not abuse its discretion in certifying the class. See Fla. Dep't of Agric. & Consumer Servs. v. City of Pompano Beach, 829 So.2d 928, 929 (Fla. 4th DCA 2002) ("The trial court's order certifying the class is subject to review under an abuse of discretion standard."); Bouchard Transp. Co. v. Updegraff, 807 So.2d 768, 771 (Fla. 2d DCA 2002) ("[T]he determination that a case meets the requirements of a class action is a factual finding that is within the trial court's discretion and will be reversed on appeal only if an abuse of discretion is shown.").
4. Three-Phase Trial PlanDecertification
We agree with the Third District that problems with the three-phase trial *1268 plan negate the continued viability of this class action. We conclude that continued class action treatment for Phase III of the trial plan is not feasible because individualized issues such as legal causation, comparative fault, and damages predominate. See Fla. R. Civ. P. 1.220(b)(3) ("A claim or defense may be maintained on behalf of a class if the court concludes that the prerequisites of subdivision (a) are satisfied, and that . . . the claim or defense is not maintainable under either subdivision (b)(1) or (b)(2), but the questions of law or fact common to the claim or defense of the representative party and the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class. . . . ").
Florida Rule of Civil Procedure 1.220(d)(4)(A) provides that "[w]hen appropriate . . . a claim or defense may be brought or maintained on behalf of a class concerning particular issues." Although no Florida cases address whether it is appropriate under rule 1.220(d)(4)(A) to certify class treatment for only limited liability issues, several decisions by federal appellate courts applying a similar provision in the Federal Rules of Civil Procedure provide persuasive authority for this approach.
Federal Rule of Civil Procedure 23(c)(4)(A) provides that "[w]hen appropriate . . . an action may be brought or maintained as a class action with respect to particular issues." In determining whether the predominance requirement of Federal Rule of Civil Procedure 23(b)(3)[10] has been met, several United States Courts of Appeals have concluded that under federal rule 23(c)(4)(A) a trial court can properly separate liability and damages issues, certifying class treatment of liability while leaving damages to be determined on an individual basis. See Olden v. LaFarge Corp., 383 F.3d 495, 509 (6th Cir.2004) (stating that the district court can properly "bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can de decided by a special master or by another method"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir.2004) (noting that "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues"); In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 139-41 (2d Cir.2001) (noting that "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues" and that "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action"); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir.1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); see also Slaven v. BP America, Inc., 190 F.R.D. 649, 658 (C.D.Cal.2000) (maintaining class status "solely for the determination of liability" and stating that "[i]f plaintiffs prevail on the liability portion of their case, the Court will determine the appropriate *1269 method of adjudicating causation and damages issues at that juncture").[11]
The Second and Seventh Circuits have also stated that the determination that class treatment of damages issues is inappropriate can be made after a finding on liability. See Carnegie, 376 F.3d at 661 (explaining that one option available to the district courts for solving problems created by the presence in a class action litigation of individual damages issues is to decertify the class after the liability trial); Visa Check/MasterMoney Antitrust Litigation, 280 F.3d at 141 (same). In Carnegie, the Seventh Circuit discussed the manageability of a class action alleging RICO violations and explained:
Often . . . there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action. The number of class members need have no bearing on the burdensomeness of litigating a violation of RICO. Whether particular members of the class were defrauded and if so what their damages were are another matter, and it may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief. That prospect need not defeat class treatment of the question whether the defendants violated RICO. Once that question is answered, if it is answered in favor of the class, a global settlement . . . will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world. Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues.
376 F.3d at 661 (citations omitted). In Visa Check/MasterMoney Antitrust Litigation, the Second Circuit concluded that the district court adequately addressed individual issues that might arise from certifying the class by specifically recognizing "its ability to modify its class certification order, sever liability and damages, or even decertify the class if such an action ultimately became necessary." 280 F.3d at 141.
In this case, the Phase I trial has been completed. The pragmatic solution is to now decertify the class, retaining the jury's Phase I findings other than those on the fraud and intentional infliction of emotion distress claims, which involved highly individualized determinations, and the finding on entitlement to punitive damages questions, which was premature. Class members can choose to initiate individual damages actions and the Phase I common core findings we approved above will have res judicata effect in those trials. See Daenzer v. Wayland Ford, Inc., 210 F.R.D. 202, 205 (W.D.Mich.2002) (entering summary judgment on the issue of liability, decertifying the class on the issue of damages and stating that "[t]he Court's *1270 decision as to liability is res judicata in any damages action individual class members decide to bring"); McCormack v. Abbott Labs., 617 F.Supp. 1521 (D.Mass.1985) (concluding that plaintiff's strict liability claim was barred by judgment for the defendants entered in a prior class action, which the plaintiff joined, before that class action was decertified).[12]
We disagree with Justice Wells' conclusion that bifurcating the trial in this manner violates article I, section 22 of the Florida Constitution. See concurring in part and dissenting in part op. at 1285-87. We recognize the concerns expressed by the Fifth Circuit Court of Appeals in Castano v. American Tobacco Co., 84 F.3d 734, 750 (5th Cir.1996), in which that court held that bifurcation of issues in a nationwide smoking class action violated the Seventh Amendment to the United States Constitution.[13] However, subsequent to its decision in Castano, the Fifth Circuit held that the risk of infringing on the parties' Seventh Amendment rights is not significant and is in fact avoided where the liability issues common to all class members are tried together by a single initial jury, and issues affecting individual class members such as causation, damages, and comparative negligence are tried by different juries. See Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 628-29 (5th Cir.1999). Recognizing that it had previously reached a different conclusion in Castano, the Fifth Circuit explained that the circumstances of Castano were distinct from those present in Mullen:
In Castano, we were concerned that allowing a second jury to consider the plaintiffs' comparative negligence would invite that jury to reconsider the first jury's findings concerning the defendants' conduct. We believe that such a risk has been avoided here by leaving all issues of causation for the phase-two jury. When a jury considers the comparative negligence of a plaintiff, "the focus is upon causation. It is inevitable that a comparison of the conduct of plaintiffs and defendants ultimately be in terms of causation." Lewis v. Timco, Inc., 716 F.2d 1425, 1431 (5th Cir.1983) (en banc); see id. (permitting the use of comparative negligence in strict liability claims). Thus, in considering comparative negligence, the phase two jury would not be reconsidering the first jury's findings of whether Treasure Chest's conduct was negligent or the [vessel] unseaworthy, but only the degree to which those conditions were the sole or contributing cause of the class member's injury. Because the first jury will not be considering any issues of causation, no Seventh Amendment implications affect our review of the district court's superiority finding.

Mullen, 186 F.3d at 628-29 (emphasis supplied).
*1271 The Fifth Circuit's reasoning in Mullen is persuasive. In this case, although the jury decided issues common to all class members, none involved whether, or the degree to which, the defendants' conduct was the sole or contributing cause of the class members' injuries, which is the pertinent question in applying the doctrine of comparative negligence. We thus follow the reasoning of Mullen and conclude that the trial plan in this case did not violate Tobacco's rights under article I, section 22 of the Florida Constitution.
5. Arguments of Engle Class's Counsel
We conclude that, under the totality of the circumstances, reversal is not warranted based on the remarks made by the Engle Class's counsel, Stanley Rosenblatt. Nevertheless, we must again remind counsel that we will not condone improper arguments. Inappropriate jury arguments in this type of case risk wasting significant judicial resources. Here, trial counsel ventured very close to the line of reversible error on a number of occasions in his attempt to counteract opposing counsel's contentions that Tobacco acted lawfully and to communicate his message to the jury that "legal doesn't make it right." However, we conclude that under the totality of the circumstances these comments did not rise to the level of reversible error.
If the issue of an opponent's improper argument has been properly preserved by objection and motion for mistrial, the trial court should grant a new trial if the argument was "so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial." Tanner v. Beck, 907 So.2d 1190, 1196 (Fla. 3d DCA 2005); see also Murphy v. Int'l Robotic Sys., Inc., 766 So.2d 1010, 1013 n. 2 (Fla. 2000) (stating the Court's decision addressing unobjected-to argument "does not impact the legal standards applicable to consideration of the issue that has been properly preserved by objection and motion for mistrial, which remains whether the comment was highly prejudicial and inflammatory"). To justify granting a motion for a new trial based on unobjected-to improper argument, the trial court must find that the improper argument is of such a nature as to reach into the validity of the trial itself to the extent that the verdict could not have been obtained but for such comments. See Murphy, 766 So.2d at 1029-30. A trial court's order granting or denying a motion for a new trial based on either objected-to or unobjected-to improper argument is reviewed for abuse of discretion. See id. at 1030-31 ("[T]he appellate court must . . . apply an abuse of discretion standard in reviewing either the trial court's grant or denial of a new trial based on the unobjected-to closing argument."); Bocher v. Glass, 874 So.2d 701, 704 (Fla. 1st DCA 2004) (reviewing a trial court's order denying a motion for rehearing based on objected-to improper argument for an abuse of discretion).
In denying Tobacco's motions for mistrial, the trial court stated:
The Court has carefully considered the Motions for Mistrial in this cause and has determined that curative instructions to the jury and/or motions to strike have been granted as requested by the movant, for most of the motions, and in any event the cumulative effect of the alleged error, was not in the opinion of the Court, sufficient to have so influenced the jury as to affect the outcome of the case considering the length of the trial, the number of witnesses presented, the quality and quantity of the testimony, the huge amount of documentary evidence, and specifically the substance of the alleged remarks. The jury in this case rendered three verdicts, each based *1272 upon a mountain of evidence over a period of two years in three separate trials. The court feels confident, that although some remarks of counsel may have been uncalled for, or subject to objection, they were not so egregious as to require a new trial.
Engle F.J., No. 94-08273 CA-22 order at 17. However, the Third District held that the comments "caused irreparable prejudice and require reversal." Engle II, 853 So.2d at 458. Specifically, the district court determined that this was accomplished in two stages:
First, by inflaming the jury with racial pandering and pleas for nullification of the law to secure entitlement to punitive damages. And second, by removing responsibility from the jury for the size of the award, through arguing the award would be subject to appellate review and that it would not be paid out in a lump sum, but rather through a payout scheme.
Id. at 459. The district court then proceeded to list all of counsel's arguments it determined were improper.
Significantly, the manner in which the district court has set forth and presented the offending argument, stringing the comments together, would certainly cause a reader to assume that the comments are prejudicial. However, this is not proper analysis for review under the totality of the circumstances. Context is crucial. To determine whether the challenged statements and arguments were in fact prejudicial, the statements cannot be evaluated in isolation but must be placed and evaluated in context. See State v. Jones, 867 So.2d 398, 400 (Fla.2004) ("[T]his Court has evaluated the prosecutor's action in context rather than focusing on the challenged statement in isolation.").
We emphasize that the duration of this trial does not mean that a comment or several comments standing alone would not warrant reversal. Nonetheless, the length of the trial is relevant to the analysis because the alleged improper statements were not made on the same day or contained within a two- or three-hour closing argument. These statements spanned a two-year period. Some comments were made during opening statements in Phase I (liability phase) in October of 1998, some during Phase I closing argument in June of 1999, and others during the closing statements in Phase II-B (punitive damages phase) in July of 2000. Many of the alleged improper comments did not even prompt an objection by Tobacco.[14]
We begin with the Third District's conclusion that plaintiffs' counsel engaged in "racial pandering" and that the jury's "runaway" verdict was evidently one inflamed by passion and prejudice. A single reference to "race" in the Phase I opening statement was in the context of the consumer studies that the defendants conducted that divide American consumers into groups. Mr. Rosenblatt's comment that "they study races" was part of a statement about the study of the American consumer: "They study kids; they study races; they divide the American consumer into groups to sell their product." In fact, when the defense objected on the basis that those *1273 comments were "only designed to prejudice the jury," the trial court rejected this argument because that was "not the context of which it's being used." Mr. Rosenblatt then followed up with the statement that this is an industry that "divides the American consumer into groups: white, black, Jewish, Christian, young, old." The trial court did not abuse its discretion by determining that these statements were made in an attempt to show how Tobacco sells its products and advertises to different groups, not to impermissibly prejudice the jury.
As to the Phase I closing argument, we agree that a series of improper remarks occurred when counsel injected race into his argument:
Are there two sides to every question? And the immediate gut reaction is: Yeah, yeah. You want to be fair and you say: Right, there's two sides to every question. What's the other side to the Holocaust? What is the other side to slavery?
An objection was made and sustained. While one could posit that this was merely an attempt to explain to the jury that there are not always two sides, several minutes later Mr. Rosenblatt returned to a race-based theme by referring to Rosa Parks:
Let's discuss the concept of legal in the context of America. I noticed in last week's newspaper, Rosa Parks, who is 86 years old, got the Congressional Gold Medal because in 1955. . . .
Mr. Rosenblatt got no further because an objection was made and sustained. Undaunted by the trial court's ruling, Mr. Rosenblatt continued:
We look back in history. We look back in history. The whole civil rights movement of the '60s was fighting against unjust laws. Dr. King was arrested in the '60s. . . .
An objection was made and overruled and Mr. Rosenblatt continued:
In this building, in this building, a temple to the law, they werethere were drinking fountains which said Whites Only.
Once again, an objection was made and overruled.
There is absolutely no justification for this series of remarks, which appears to compare the tobacco industry with slavery and, by invoking civil rights leaders Rosa Parks and Martin Luther King, appealed to the jury's sense of outrage for the injustices visited upon African-Americans in this country. We condemn these tactics of Mr. Rosenblatt. His attempt to incite racial passions was conduct unbecoming an attorney practicing in our state courts.
Nevertheless, we note that the trial court sustained objections to several of these remarks and no motion for mistrial was made or curative instruction requested. In addition, there was no further race-based argument during the remainder of the closing, and, significantly, no such references were made in any of Mr. Rosenblatt's Phase I rebuttal argument.
We next discuss the Third District's conclusion that Mr. Rosenblatt's Phase I closing argument was also replete with impermissible references to jury nullification. The relevant comments were made in response to Tobacco's preemption defense: that the warnings on the cigarettes were as provided by law. Although compliance with the federal warnings preempted any claim based on failure to warn, it did not eliminate the other causes of action that the jury had to consider in Phase I. As for the comment "legal don't make it right," Mr. Rosenblatt was referring to the answers given by the CEO for Brown & Williamson, Nick Brookes. Mr. *1274 Brookes was asked what he would do with his product if he became convinced that cigarettes caused cancer and heart disease. His reply was it would not affect his business because "it's a legal product." Mr. Rosenblatt's response was that "legal don't make it right." No objection was made. In fact, this theme continued in rebuttal when Mr. Rosenblatt explained without objection:
It's a legal product. There is no question about it. But a legal product does not mean that the cigarette companies are not responsible when their product causes harm and death to their customers. And being legal is a very relative term.
These arguments were not an attempt to tell the jury to ignore the law.
We conclude, under the totality of the circumstances, including that several objections were sustained and a number of the arguments were unobjected-to, that the defendants did not sustain their burden of proving reversible error under Murphy or that the trial court abused its discretion in denying the motion for new trial as to Phase I. As to Phase II, we note that no arguments have been raised as to impermissible comments during Phase II-A, in which the jury determined compensatory damages as to the three class representatives. Moreover, a review of the verdicts reveals that each verdict reflected a careful and differentiated analysis as to comparative fault and individual damages and in no way justifies the Third District's overall conclusion that this was a runaway jury inflamed by race because of the arguments directed to the four of the six members of the jury who were African-American. As to Phase II-B, because we are reversing the punitive damages award we do not separately review each of these arguments except to again note that no race-based arguments were made.
6. Reversal of Final Judgments in Favor of the Three Class Representatives
The issue of whether two of the three Engle Class representatives are properly included within the class as certified by the trial court and approved on appeal involves the application of the law to a set of undisputed facts. "[W]here the facts are essentially undisputed, the legal effect of the evidence will be a question of law." Town of Palm Beach v. Palm Beach County, 460 So.2d 879, 882 (Fla.1984). Questions of law are reviewed de novo.
The trial court originally certified this class on October 31, 1994. This order provided for notice to the members of the class by way of publication and indicated that the trial court was to hold an additional hearing "to discuss the content, timing and manner of providing notice." At that time, the class was described as:
All United States citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine. The class shall specifically exclude officers, directors and agents of the [d]efendants.
Engle I, 672 So.2d at 40. The class certification was affirmed by the Third District on January 31, 1996, but the class membership was altered by the district court to include only Florida citizens and residents. See id. at 42. Subsequent to the district court's modification limiting the class to Florida citizens, the trial court issued an amended order on November 21, 1996, recertifying the more limited class.
The final class description could lead one to believe that the class is open-ended because there is no stated cut-off date for membership. However, an open-ended class would not allow for notice and *1275 an opportunity to opt out as required by rule 1.220(d)(2) and may implicate potential class members' right of access to the courts under article I, section 21 of the Florida Constitution.
Further, without the ability to opt out, potential plaintiffs could argue that they should be allowed to intervene after a judgment in favor of the class or, alternatively, that they are not bound by an adverse judgment. Cf. Katz v. Carte Blanche Corp., 496 F.2d 747, 759 (3d Cir. 1974) (explaining that prior to the adoption of Federal Rule of Civil procedure 23(c)(2) some courts suggested that "it would be proper to make the class action determination and permit class members to intervene after the defendant's liability had been determined in the single lawsuit," that this "one-way intervention had the effect of giving collateral estoppel effect to the judgment of liability in a case where the estoppel was not mutual," and that the notice and opt-out provisions were adopted to give mutual estoppel effect to the judgment on liability). A finite class is necessary to avoid multiple similar lawsuits and to make legal process more effective and expeditious, important goals of a class action suit. See Tenney v. City of Miami Beach, 152 Fla. 126, 11 So.2d 188, 189 (1942) ("The very purpose of a class suit is to save a multiplicity of suits, to reduce the expense of litigation, to make legal processes more effective and expeditious, and to make available a remedy that would not otherwise exist.").
The plain language of the class certification indicates that the trial court anticipated that the class would be cut off or limited to the date of final certification. The phrase "who have suffered, presently suffer or have died" supports the view that the class should include only those people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court. Moreover, although not controlling, federal case law supports the interpretation that the date of final class certification should be presumed the proper cut-off date for class membership. See Sosna v. Iowa, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ("A litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court.") (citing Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962)); Davis v. Ball Mem'l Hosp. Ass'n, 753 F.2d 1410, 1420 (7th Cir. 1985) ("To be a proper class representative, the named plaintiff must be a member of the class at the time the class action is certified.").
In our view, it is reasonable to conclude that the cut-off date for class membership is November, 21, 1996, the date the trial court recertified the class and issued an amended order conforming the class description to the Third District's decision. It was with this November 21, 1996, order that the circuit court first ordered that notice to potential class members be published in newspapers and magazines circulated in Florida. The language employed by the United States Supreme Court in Sosna, although not addressing a scenario such as we face today, is not contrary to our conclusion.
Relying upon Davis v. Ball Memorial Hospital Association, the district court held that "[s]ince Farnan was diagnosed in April 1996, and Della Vecchia was diagnosed in February 1997, they are clearly excluded from the class and the judgment in their favor must be reversed." Engle II, 853 So.2d at 454 n. 23 (emphasis supplied). However, "diagnosis" as a qualifying factor does not appear anywhere in the description of the class certified. Rather, the class is described as those "who have suffered, presently suffer or *1276 have died from diseases and medical conditions." Engle I, 672 So.2d at 40 (emphasis supplied). The critical event is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself.
Our review of the medical records demonstrates that class representative Farnan was formally diagnosed with lung cancer in March of 1996, clearly demonstrating her disease had manifested by that time. Therefore, she was a proper member of the class at the time of the circuit court's November 21, 1996, order. As for class representative Della Vecchia, it was noted by her doctors in early 1997 that she had a past medical history of "COPD" and significant hypertension. Thus, Della Vecchia's medical records indicate that she had been suffering from a tobacco-related disease prior to the time of certification and is also properly included as a class member. We therefore quash the district court's reversal of judgment entered in favor of class representatives Farnan and Della Vecchia and hereby order that the judgments be reinstated.
In addition to reversing the judgments in favor of Farnan and Della Vecchia, the district court also held that the judgment in favor of Tobacco should have been entered as to all of class representative Amodeo's claims. See Engle II, 853 So.2d at 455 n. 23. We agree that the district court properly held that all judgments in favor of class representative Amodeo were barred by the applicable statute of limitations.
6. Final Judgments Entered in Favor of the Three Class Representatives in Favor of Liggett and Brooke
As noted above, the final judgments entered in favor of class representative Amodeo, including those against Liggett and Brooke, must be reversed because Amodeo's claims are barred by the statute of limitations. We also agree with the Third District that the judgments against defendants Liggett and Brooke in favor of Farnan and Del Vecchia must be reversed because there was insufficient evidence to support these judgments. As the Third District explained, "it is undisputed that the Liggett defendants did not manufacture or sell any of the products that allegedly caused injury to the individual plaintiff representatives. It is also undisputed that the jury found the Liggett defendants zero percent at fault with respect to each of the named plaintiffs." Engle II, 853 So.2d at 466 n. 46. A defendant who is found to be zero percent at fault for a plaintiff's damages cannot be held jointly and severally liable for those damages. We agree with the Third District that this inconsistency in the verdict requires reversal of the judgments entered against Liggett and Brooke. See id.

CONCLUSION
In conclusion, we approve the Third District's holding that the $145 billion award of punitive damages must be vacated. However, we disapprove the Third District's conclusion that the class action punitive damages claims were barred by the FSA.
We also disapprove the Third District's holding that the trial court abused its discretion in denying Tobacco's motion for a mistrial due to improper argument by the Engle Class's counsel. We uphold the award of compensatory damages as to plaintiffs Farnan and Della Vecchia, and approve the reversal of the entry of judgment in favor of Amodeo. However, the judgments against defendants Liggett and Brooke must reversed.
We approve the Phase I findings for the class as to Questions 1 (that smoking cigarettes *1277 causes aortic aneurysm, bladder cancer, cerebrovascular disease, cervical cancer, chronic obstructive pulmonary disease, coronary heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma), complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer), 2 (that nicotine in cigarettes is addictive), 3 (that the defendants placed cigarettes on the market that were defective and unreasonably dangerous), 4(a) (that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both), 5(a) (that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment), 6 (that all of the defendants sold or supplied cigarettes that were defective), (7) (that all of the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said defendants), and 8 (that all of the defendants were negligent). Therefore, these findings in favor of the Engle Class can stand.
The class consists of all Florida residents fitting the class description as of the trial court's order dated November 21, 1996. However, we conclude for the reasons explained in this opinion that continued class action treatment is not feasible and that upon remand the class must be decertified. Individual plaintiffs within the class will be permitted to proceed individually with the findings set forth above given res judicata effect in any subsequent trial between individual class members and the defendants, provided such action is filed within one year of the mandate in this case. We remand this case to the Third District for further proceedings consistent with this opinion.
It is so ordered.
ANSTEAD and PARIENTE, JJ., concur.
LEWIS, C.J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
WELLS, J., concurs in part and dissents in part with an opinion, in which BELL, J., concurs.
CANTERO, J., recused.
LEWIS, C.J., concurring in part and dissenting in part.
I concur in the majority's opinion and most of the reasoning employed therein. However, I cannot agree with the majority's analysis and conclusion with regard to entitlement to punitive damages. For the reasons that follow, in my view Florida law clearly requires that the jury's determination of entitlement to punitive damages which resulted in Phase I must stand.

PHASE I FINDINGS ON ENTITLEMENT TO PUNITIVE DAMAGES
Although I do agree with the majority's conclusion that the Third District misapplied our decision in Ault v. Lohr, 538 So.2d 454, 456 (Fla.1989), in holding that compensatory damages must be determined before a jury can consider entitlement to punitive damages, I cannot agree with the majority's view that the trial court erred in allowing the jury to consider the entitlement of the class to punitive damages during Phase I of the trial based *1278 on the majority's conclusion that proof of liability, which includes both reliance and causation, is a missing predicate here to the determination of entitlement to punitive damages. For the reasons that follow, I would allow the jury's determination of punitive conduct and of entitlement to punitive damages to stand for the class to be later applied as the case proceeds.
This Court has previously addressed "whether a plaintiff can recover punitive damages where the factfinder has found a breach of duty but no compensatory or actual damages have been proven." Ault v. Lohr, 538 So.2d 454, 456 (Fla.1989). In Ault, we clearly recognized that "an express finding of a breach of duty should be the critical factor in an award of punitive damages." Id. Further, this Court has held that "a finding of liability alone will support an award of punitive damages `even in the absence of financial loss for which compensatory damages would be appropriate.' "Id. (quoting Lassitter v. Int'l Union of Operating Eng'rs, 349 So.2d 622, 626 (Fla.1977)); see also Mortellite v. Am. Tower, L.P., 819 So.2d 928, 935 (Fla. 2d DCA 2002) (concluding that, based on the trial court's finding of breach of duty, the appellant was ultimately entitled to a punitive damage award even if, after remand, it was again determined that he was not entitled to compensatory damages); Horizon Leasing v. Leefmans, 568 So.2d 73, 75 (Fla. 4th DCA 1990) ("[A] plaintiff can recover punitive damages where the fact finder has found a breach of duty but no compensatory or actual damages have been proven.").
In this matter, Tobacco asserts, and the majority agrees, that the jury in Phase I only determined that Tobacco breached its duty and that a breach of duty does not constitute "a finding of liability" under Ault. Contrary to this assertion, the Phase I jury in the present case found Tobacco responsible with regard to the common core issues pertaining to liability and general causation. This is supported by the fact that the trial plan only allowed the jury to proceed to the next stage of Phase Ia determination of entitlement to punitive damagesif liability was found. The final judgment awarding compensatory damages to the three class representatives and punitive damages to the entire class was only possible after liability was determined because a judgment for damages could not be entered if there had been no finding of liability. See Oliveira v. Ilion Taxi Aero LTDA, 830 So.2d 241, 242 (Fla. 4th DCA 2002) (recognizing "as does Ault, that as a matter of law a judgment for damages cannot be entered where there is no finding of liability"); Cont'l Assurance Co. v. Davis, 538 So.2d 542, 544 (Fla. 1st DCA 1989) (concluding that "absent the jury's finding of liability on the underlying fraud issue, there can be no valid award of punitive damages," citing Ault); Cloutier v. Cent. Contracting, Inc., 418 So.2d 1233, 1234 (Fla. 5th DCA 1982) (concluding that a verdict finding damages without finding liability cannot support the damage award). Pursuant to Ault, the jury's finding of liability and responsibility with regard to the common core issues alone in Phase I could support the jury's determination that the class was entitled to punitive damages, notwithstanding that compensatory damages have not yet been awarded to all class members. In fact, a final judgment awarding punitive damages has been affirmed notwithstanding that the judgment awarded no compensatory damages. See Russin v. Richard F. Greminger, P.A., 563 So.2d 1089 (Fla. 4th DCA 1990) (citing Ault). A finding of liability, not compensatory damages, is the sine qua non of entitlement to a punitive damage award.
In support of its argument that compensatory damages are a prerequisite for *1279 awarding punitive damages, Tobacco relies, as did the subsequent panel in Engle II, on only a concurring opinion in Ault, in which it was stated:
The crucial element in determining whether punitive damages may be awarded absent an award of compensatory damages is proof of the underlying cause of action. Where actual damage is an essential element of the underlying cause of action, an award of compensatory damages must be a prerequisite to an award of punitive damages. This case involved the torts of assault and battery, which do not require proof of actual damage.
853 So.2d at 457 (Ehrlich, C.J., concurring specially). However, a majority of this Court did not agree with that statement and did not join with that concurring opinion and, therefore, it is of no precedential value whatsoever. See Greene v. Massey, 384 So.2d 24, 27 (Fla.1980) ("A concurring opinion does not constitute the law of the case nor the basis of the ultimate decision unless concurred in by a majority of the Court. . . . The special concurring opinion has no precedential value and it cannot serve to condition or limit the concurrence in the [majority] opinion. . . ."); Lendsay v. Cotton, 123 So.2d 745, 746 (Fla. 3d DCA 1960) ("A concurring opinion has no binding effect as precedent; such an opinion represents only the personal view of the concurring judge and does not constitute the law of the case."). Moreover, neither the Ault court nor any other Florida court has ever addressed Ault in the class action context. Due to the uniqueness and purpose of the class action device, which allows a jury to determine liability with regard to common issues first before determining individual damages, in my view, the jury's verdict in Phase I finding Tobacco liable with regard to the common issues is a sufficient predicate to constitute a "finding of liability" under Ault. This conclusion is supported by the fact that had the jury in Phase I found Tobacco not liable with regard to the common issues of liability and general causation each class member's claim at that point would have been rendered moot, thereby precluding Phase II.
In addition, a key factor in considering whether compensatory damages should be awarded prior to a determination of entitlement to punitive damages in a class action is whether the awarding of one is critical to awarding the other. In other words, is the relative timing of the awards the determinative factor? I conclude that the timing of the awards should not be the absolute controlling factor.
Compensatory and punitive damages serve distinct purposes. See Arab Termite & Pest Control of Fla., Inc. v. Jenkins, 409 So.2d 1039, 1042-43 (Fla.1982). In Arab Termite we recognized the distinction between compensatory and punitive damages, specifically:
[T]he amount of compensation for loss is an entirely separate matter from the amount of punitive damages. Punitive damages apply to wrongdoing not covered by the criminal law, where the private injuries inflicted partake of public wrongs. They are to be measured by the enormity of the offense, entirely aside from the measure of compensation for the injured plaintiff.
Jenkins, 409 So.2d at 1042-43. In awarding punitive damages, the focus is on the defendant's conduct, not on the conduct of the plaintiff or the extent of the injury to be compensated. See Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 474 (5th Cir. 1986). While the purpose of compensatory damages is "to restore the injured party to the position it would have been [in] had the wrong not been committed," Laney v. Am. Equity Inv. Life Ins. Co., 243 F.Supp.2d *1280 1347, 1354 (M.D.Fla.2003), the purpose of punitive damages "is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future." Owens-Corning Fiberglas Corp. v. Ballard, 749 So.2d 483, 486 (Fla.1999). "Punitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights of others." W.R. Grace & Co.-Conn. v. Waters, 638 So.2d 502, 503 (Fla.1994). The punitive damage inquiry, unlike that for compensatory damages, "focuses primarily on the egregiousness of the defendant's conduct." Watson v. Shell Oil Co., 979 F.2d 1014, 1019 (5th Cir.1992).
Moreover, the United States Supreme Court has also recognized the distinct purposes of compensatory and punitive damages:
The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. The latter, which have been described as "quasi-criminal," operate as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation.
Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citations omitted). Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Punitive damages "serve a broader function; they are aimed at deterrence and retribution." State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).
Entitlement to punitive damages, therefore, aimed at deterrence and retribution for a public wrong, is distinct and not dependent on the specific injury suffered by the class member. While no plaintiff in the Engle Class may ultimately receive an award of punitive damages without proving that he or she suffered actual damages in Phase III, the determination with regard to entitlement to punitive damages on a class basis need not be made concurrently with an evaluation of a particular claimant. See Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1217 (6th Cir.1988) ("[T]he district court need not defer its award of punitive damages prior to determining compensatory damages for the entire class of 128 individuals. So long as the court determines the defendant's liability and awards representative class members compensatory damages, the district court may in its discretion award punitive damages to the class as a whole at that time.") Moreover, although the Unites States Supreme Court has recognized that "compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker," it has never held that entitlement to these damages must absolutely be assessed at the same time. Cooper Indus., Inc., 532 U.S. at 432, 121 S.Ct. 1678 (emphasis supplied). Therefore, in my view, the relative timing of the assessment of entitlement to punitive damages and a compensatory damage award is not critical. See Jenkins, 782 F.2d at 474. But see Allison v. Citgo Petroleum Corp., 151 F.3d 402, 417-18 (5th Cir.1998).
It is important to highlight the distinction between a jury determination that a class is entitled to punitive damages before *1281 compensatory damages have been actually awarded versus an actual jury award of a specific amount to a class as a lump sum punitive damage award before compensatory damages have been determined. In my view, the former comports with the requirements of due process while the latter, as the majority correctly concludes, does not. However, contrary to the conclusion reached by the majority, in my view, the trial court did not abuse its discretion in allowing the jury in Phase I of the trial plan to determine whether the class was entitled to punitive damages after liability regarding the common issues had been determined. Notwithstanding the above, I concur in the majority's holding which disapproves the trial court's trial plan in Phase II-B in which it allowed a lump sum punitive damage award to be determined prior to a determination of individual class members' compensatory damage awards, which will occur in Phase III, based on due process concerns. A simple determination of entitlement to punitive damages on a class basis does not violate Tobacco's due process rights because no class member will be awarded punitive damages until the class member has been awarded compensatory damages in Phase III. See In re New Orleans Train Car Leakage Fire Litigation, 795 So.2d 364, 379 (La.Ct.App.2001) (determining that there was no due process violation where the quantum of punitive damages was determined when the quantum of compensatory damages had been determined as to only 20 of 8,047 plaintiff class members). Ultimately, Tobacco will not be required to pay a class member punitive damages until that class member demonstrates his or her entitlement to compensatory damages in Phase III. Tobacco will have the opportunity to be heard at each Phase III trial with regard to why that individual plaintiff is not entitled to compensatory damages. To date, Tobacco has not been required to pay any class member a punitive damage award. Therefore, because Tobacco in Phase III will be heard with regard to each class member's compensatory damage claim before they are required to pay that class member any punitive damages, I conclude that Phases I and II-A of the trial court's trial plan did not violate Tobacco's due process rights, and that the jury's finding with regard to entitlement to punitive damages should stand. The majority today has inflicted serious harm to class actions which involve egregious behavior and has done so contrary to the clear law of Florida.

CONCLUSION
For the above reasons, I respectfully dissent from the portion of the majority opinion that reasons and holds that it was error for the trial court to allow the jury to make a determination of the entitlement of the class to punitive damages during Phase I of the trial. If the majority had properly analyzed and discussed the availability of the class action status here the contrary result on the punitive issue would have been obvious. I concur in the majority's decision in all other respects.
QUINCE, J., concurs.
WELLS, J., concurring in part and dissenting in part.
I concur with the following in the majority decision and opinion:
1. Approving the Third District Court of Appeal's reversal of the $145 billion class action punitive damages award.
2. Approving the Third District's reversal of the judgment on behalf of plaintiff Amodeo.
3. Holding that the Third District misapplied Young v. Miami Beach Improvement Co., 46 So.2d 26 (Fla.1950), to the extent that the Third District's decision *1282 would bar individual smokers' claims. I do not, though, join in the majority's opinion to the extent that it implies that there could be a proper class action for smokers' claims.
4. Holding that the trial court erred in allowing the jury to find entitlement to punitive damages in Phase I of the trial.
5. Holding that the class be decertified.
I dissent as to all other parts of the majority decision and opinion for the reasons that I will write about in this opinion. In sum, I would affirm the remainder of the Third District's extensive opinion, except that I would provide that any individual who can show that he or she relied on being a member of the class certified by the trial court in this case and based on that reliance did not bring an individual action would be allowed to file suit within one year of our decision becoming final.[15]

ANALYSIS

Overview
The bottom line is that this was not properly a class action. The Third District's decision that this was not a proper class action is in accord with the overwhelming majority of courts from numerous jurisdictions. The Third Circuit in Barnes v. American Tobacco Co., 161 F.3d 127, 143 (3d Cir.1998), explains why:
In decertifying the class, the District Court decided that "too many individual issues exist which prevent this case from proceeding as a class action." Barnes [v. American Tobacco Co.], 176 F.R.D. [479,] at 500. As noted, the District Court found that addiction, causation, and affirmative defenses all presented individual issues not properly decided in a class action. We believe that addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification. As in Amchem [Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)], plaintiffs were "exposed to different . . . products, for different amounts of time, in different ways, and over different periods." See Amchem, [521 U.S. at 624, 117 S.Ct. 2231] (citation omitted). These disparate issues make class treatment inappropriate. [n. 19]
[n. 19.] We note that the individual issues raised by cigarette litigation often preclude class certification. See, e.g., Castano v. The American Tobacco Co., 84 F.3d 734 (5th Cir.1996) (decertifying 23(b)(3) class because individual issues predominated); Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90 (W.D.Mo.1997) (denying certification under 23(b)(1), (2) & (3) because of the presence of individual issues); Ruiz v. The American Tobacco Co., 180 F.R.D. 194 (D.Puerto Rico 1998) (denying certification under 23(b)(2) and 23(b)(3) because "cigarette addiction" claims raised too *1283 many individual issues). Significantly, no federal appeals court has upheld the certification [of] a class of cigarette smokers or reversed a District Court's refusal to certify such a class. In some state cases, however, plaintiff smokers have succeeded in certification. See Richardson v. Phillip Morris, No. 96145050/CE212596[, 1998 WL 35164799] (Baltimore Cir. Ct. Jan. 28, 1998) (certifying class of Maryland smokers seeking compensatory and punitive damages); R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. App. 3 Dist.1996), rev. denied, 682 So.2d 1100 (1996) (certification of state-wide class of tobacco smokers suing for damages caused by smoking).[[16]]
Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir.1996), was the initial case which comprehensively examined whether a class action could be pursued in tobacco litigation. While Castano was a class action claiming a nationwide class and the present case was limited to a Florida class, much of the analysis is applicable to the present case.[17] The Castano court stated:
The Castano class suffers from many of the difficulties that the Georgine [v. Amchem Prods., 83 F.3d 610 (3d Cir. 1996),] court found dispositive. The class members were exposed to nicotine through different products, for different amounts of time, and over different time periods. Each class member's knowledge about the effects of smoking differs, and each plaintiff began smoking for different reasons. Each of these factual differences impacts the application of legal rules such as causation, reliance, comparative fault, and other affirmative defenses.
Id. at 742-43 n. 15. The United States Supreme Court's analysis in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 624-25, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), instructs on the point in rejecting a settlement of an asbestos litigation class action. Other cases with similar holdings are: Philip Morris USA Inc. v. Hines, 883 So.2d 292 (Fla. 4th DCA 2003); Estate of Mahoney v. R.J. Reynolds Tobacco Co., 204 F.R.D. 150, 156 (S.D.Iowa 2001); Badillo v. American Tobacco Co., 202 F.R.D. 261, 264 (D.Nev.2001); Guillory v. American Tobacco Co., No. 97 C 8641, 2001 WL 290603 at *20, *24, *27 (N.D.Ill. Mar.20, 2001); Aksamit v. Brown & Williamson Tobacco Corp., No. C.A. 6:XX-XXXX-XX, 2001 WL 1809378 at *24 (D.S.C. Dec.29, 2000); Thompson v. American Tobacco Co., 189 F.R.D. 544, 551 (D.Minn.1999); Hansen v. American Tobacco Co., No. LR-C-96-881, 1999 WL 33659388, *2, 1999 U.S. Dist. LEXIS 11277 at *7 (E.D.Ark. July 21, 1999); Insolia v. Philip Morris Inc., 186 F.R.D. 535, 546 (W.D.Wis.1998); Emig v. American Tobacco Co., 184 F.R.D. 379, 389 (D.Kan.1998); Barreras Ruiz v. American Tobacco Co., 180 F.R.D. 194, 197 (D.P.R.1998); Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 94 (W.D.Mo.1997); In re Simon II, 407 F.3d 125 (2d Cir.2005); Arch v. American Tobacco Co., Inc., 175 F.R.D. 469 (E.D.Pa. 1997).
I recognize that a problem exists in this case because of the interlocutory appeal to *1284 the Third District in which a different panel of the Third District approved a class action for a class composed of Florida smokers. But I also recognize that the 1996 decision by the Third District was made at a time when this case was only in the pleading stage. At the time of the 1996 decision, there was no trial plan with Phases I, II, and III. In fact, the three individuals who became the class representatives and who presented claims for compensatory damages, Farnan, Della Vecchia, and Amodeo, were added as class representatives after the Third District's 1996 decision. Though the trial court proceeded on the basis of the 1996 Third District decision, for the reasons stated by the Second District in Toledo v. Hillsborough County Hospital Authority, 747 So.2d 958 (Fla. 2d DCA 1999), the 1996 decision in the interlocutory appeal should not be given law-of-the-case effect: "Due to the trial court's broad authority to alter or amend orders determining class certification, the doctrine of law of the case `applies only sparingly in class certification proceedings.' Fair Housing for Children Coalition, Inc. v. Pornchai Int'l, 890 F.2d 420, at 421 (9th Cir.1989) (unpublished disposition)." Toledo, 747 So.2d at 960. The present majority apparently agrees because the majority ultimately decertifies the class.
In what I conclude will be harmful and confusing precedent, the majority saves some of the jury findings in Phase I of the class action before decertifying the class. I do not join in doing that; rather, I would follow the overwhelming majority of courts and hold that this was not a proper class action. The result of the majority "retaining the jury's Phase I findings" is not, as the majority asserts, "pragmatic," majority op. at 1269; rather, it is problematic. Under the majority's holding, the class closed a decade ago. Who are the individuals that are to get the use of these "findings"? How will a trial court make that determination? Does the individual only have to have an injury manifest prior to November 21, 1996, or does the individual have to have notice of the class action? Does the majority's holding mean that the statute of limitation has not run on any Florida resident's claim whose injury manifested prior to November 21, 1996? How long do individuals have to file such individual actions? How are these findings to be used in cases in which the findings are used? I assume that any individual cases filed on claims in which injuries manifested on November 22, 1996, or later do not get the benefit of these findings, so that there will be two classes of claimants. These are only a few of the issues which arise in application of the majority's holding.

Punitive Damages
As previously stated, I concur in the majority's holding that agrees with the Third District that the trial court erred in allowing the jury to consider entitlement to punitive damages during the Phase I trial. I do not concur, however, with the majority's opinion that an award of compensatory damages is not a prerequisite to a finding of entitlement to punitive damages and that an award of compensatory damages need not precede a determination of entitlement to punitive damages. I do not concur because the majority's opinion is in conflict with the Supreme Court's decisions in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).
The Supreme Court has made it clear that punitive damages must be in ratio to compensatory damages. In fact, the majority quotes a passage from the Campbell decision which makes this clear. It necessarily *1285 follows, then, that there must be compensatory damages in order for punitive damages to be in ratio to compensatory damages. Thus, I conclude that the majority decision here is in conflict with the Supreme Court decisions and is thereby erroneous.

Law-of-the-Case Class Certification
I have previously stated why the law-of-the-case doctrine should not apply to the Third District's 2003 review of this case, which followed the Phase I and Phase II jury trials and judgments. Florida Department of Transportation v. Juliano, 801 So.2d 101 (Fla.2001), should not be applied in this class action. Moreover, since the majority ends up decertifying the class, I fail to understand the point of the majority's discussion of this issue. Majority op. at 1265-67.
The Third District in its 2003 opinion correctly explains why the law-of-the-case doctrine does not apply. Liggett Group, Inc. v. Engle, 853 So.2d 434, 443 n. 4 (Fla. 3d DCA 2003). Furthermore, as the majority states, "Of course, this Court is not bound by the Third District's law of the case." Majority op. at 1267.
In the present case, the trial plan was not decided by the trial court until after the 1996 interlocutory appeal. The defendants objected to the trial plan and moved to decertify the class. The trial court denied the motion, although it expressed reservations about the manageability of the case and predicted that the necessary individual hearings will place a serious demand upon Florida's judicial resources. The denial of the defendant's motion to decertify was then appealed to the Third District. The Third District dismissed the appeal for lack of jurisdiction but expressly stated that the defendants had a right to obtain review of the propriety of the order by plenary appeal from any adverse judgment. Engle, 853 So.2d at 443. But now the majority in this Court makes the trial plan unreviewable in the district court by applying the law of the case to the earlier certification. Certainly, the trial plan should have been reviewable by the district court as part of a review of the motion to decertify after the trial plan was ordered.[18] It was the trial plan which demonstrated just how unworkable this class action was and why the class should have been decertified. It was the trial plan which resulted in the errors upon which the majority in this Court reverses the trial court's final judgment.
It was the trial plan which resulted in the Phase I jury deciding whether the defendants were negligent, breached warranties, were strictly liable, or were guilty of fraud and misrepresentation, but Phase II decided the claimant's comparative fault. Such a bifurcation of issues violates article I, section 22 of the Florida Constitution, just as the Fifth Circuit in Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir.1996), found that such a bifurcation of *1286 issues violated the Seventh Amendment to the United States Constitution.
The Castano court explained why a bifurcation of the comparative negligence issue from the defendant's negligence issue with a trial by separate juries is a violation of the Seventh Amendment to the United States Constitution:
Another factor weighing heavily in favor of individual trials is the risk that in order to make this class action manageable, the court will be forced to bifurcate issues in violation of the Seventh Amendment. This class action is permeated with individual issues, such as proximate causation, comparative negligence, reliance, and compensatory damages. In order to manage so many individual issues, the district court proposed to empanel a class jury to adjudicate common issues. A second jury, or a number of "second" juries, will pass on the individual issues, either on a case-by-case basis or through group trials of individual plaintiffs.
The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues. [n. 30] Thus, Constitution allows bifurcation of issues that are so separable that the second jury will not be called upon to reconsider findings of fact by the first:
[T]his Court has cautioned that separation of issues is not the usual course that should be followed, and that the issue to be tried must be so distinct and separable from the others that a trial of it alone may be had without injustice. This limitation on the use of bifurcation is a recognition of the fact that inherent in the Seventh Amendment guarantee of a trial by jury is the general right of a litigant to have only one jury pass on a common issue of fact. The Supreme Court recognized this principle in Gasoline Products [Co., Inc. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)]. . . . The Court explained . . . that a partial new trial may not be "properly resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Such a rule is dictated for the very practical reason that if separate juries are allowed to pass on issues involving overlapping legal and factual questions the verdicts rendered by each jury could be inconsistent.

Alabama v. Blue Bird Body Co., 573 F.2d 309, 318 (5th Cir.1978) (citations and footnotes omitted).
[n. 30] "[N]o fact tried by jury, shall be otherwise re-examined in any Court of the United States . . ." U.S. Const. amend VII.
The Seventh Circuit recently addressed Seventh Amendment limitations to bifurcation. In [In re] Rhone-Poulenc [Rorer, Inc.], 51 F.3d [1293] at 1302-03, Chief Judge Posner described the constitutional limitation as one requiring a court to "carve at the joint" in such a way so that the same issue is not reexamined by different juries. "The right to a jury trial . . . is a right have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact." Id. at 1303.
Severing a defendant's conduct from comparative negligence results in the type of risk that our court forbade in Blue Bird. Comparative negligence, by definition, requires a comparison between the defendant's and the plaintiff's conduct. Rhone-Poulenc, 51 F.3d at *1287 1303 ("Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant.") At a bare minimum, a second jury will rehear evidence of the defendant's conduct. There is a risk that in apportioning fault, the second jury could reevaluate the defendant's fault, determine that the defendant was not at fault, and apportion 100% of the fault to the plaintiff. In such a situation, the second jury would be impermissibly reconsidering the findings of a first jury. The risk of such reevaluation is so great that class treatment can hardly be said to be superior to individual adjudication.
84 F.3d at 750-51. Every smoker's case has a substantial comparative fault defense.
The majority's opinion approves one jury making the decision on the defendant's negligence and a different jury making a decision on the plaintiff's negligence and comparing the two. The second jury will be required to accept the first jury's findings as to the defendant's negligence and then in some way compare the defendant's negligence with the second jury's finding as to the plaintiff's negligence. It is only logical that comparative negligence, which the second jury will be finding, is an evaluation of how the negligence of the two parties relate. That can only be accomplished by weighing the evidence of each party's negligence as a cause of the defendant's negligence, which the majority's bifurcation of negligence and comparative negligence prevents from occurring on the basis of one jury's findings. Similarly, there is no logical way to decide the issues of misrepresentation and the element within misrepresentation of reliance by separate juries without having the second jury required to accept the findings of the first jury. Both constitutionally and practically, these are issues which should be decided by one fact-finder so that there is consistency in the resolution of the facts.
The majority states that it will follow the Fifth Circuit's two-to-one majority opinion in Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 628-29 (5th Cir. 1999), rather than the Fifth Circuit's decision in Castano. I cannot agree. Mullen was not a smoker's case. Mullen was a case brought under the federal Jones Act,[19] in which the claims by the individuals were from the same defective ventilation system in a floating casino that occurred over the same general period of time. The Mullen majority pointed out that these were important distinguishing facts from Castano and from the asbestos case decided by the Supreme Court in Amchem Products, Inc. Moreoverand very significantlythe Mullen majority specifically pointed out that as in Treasure Chest, the defendant in the Mullen case did not raise in the trial court the Seventh Amendment issue of having one jury consider the defendant's conduct and another consider the plaintiffs' comparative negligence. I find the dissent in Mullen, which adheres to Castano and In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1302-03 (7th Cir.1995), to be the view which is correct for smokers' cases in Florida.
Finally, the majority opinion decides that the cut-off date for class membership should be November 21, 1996. Majority op. at 1274. This was, of course, after the Third District decision in the interlocutory appeal, which was issued on January 31, 1996. R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39 (Fla. 3d DCA 1996). It is wholly inconsistent for the majority to apply the law of the 1996 case to prevent the Third District's 2003 review of the certification and to also hold that the cut-off date *1288 for the class was after the 1996 review. This results in the actual order of certification being unreviewable in the district court.

Closing Arguments and Individual Judgments
I dissent from the majority's decision that the blatantly improper closing arguments do not require reversal. The Third District's decision concerning this offensive argument was precisely correct. There is no way to read the argument of plaintiff's counsel other than to conclude that it dwelled upon issues which are and should be per se reversible error because the arguments were intended to have jurors make their decisions on issues which had no relevancy or materiality in the case. These arguments were extreme in my view. I will not join in a decision which affirms judgments which in part are a result of such arguments.
It is because of the closing arguments that the judgments for compensatory damages on behalf of Farnan and Della Vecchia against the defendants other than Liggett and Brooke[20] must be reversed. Additionally, the individual verdicts cannot stand because the closing argument in Phase I was not only materially tainted by racial pandering and pleas for nullification but was also materially tainted by arguments which would have only been appropriate in seeking punitive damages. Since, as the majority has held, it was improper for the trial court to allow the Phase I jury to consider punitive damages, the arguments in support of punitive damages were improper and wrongfully prejudiced the defendants from receiving a fair trial in Phase I. This is still another reason why it is error for the majority to allow some of the Phase I jury findings to stand.

CONCLUSION
For the foregoing reasons, I concur with the majority's reversal of the $145 billion judgment; reversal of the judgment in behalf of Amodeo; holding that the Third District misapplied Young v. Miami Beach Improvement Co., 46 So.2d 26 (Fla.1950); and holding that the trial court erred in allowing the jury to find entitlement to punitive damages in Phase I of the trial. I dissent to all other parts of the majority decision and opinion.
BELL, J., concurs.
NOTES
[1] Justices Wells and Bell would affirm the Third District as to its conclusions regarding the class action.
[2] We also note that the defendants never objected to Farnan or Della Vecchia as a proper members of the class. Although the defendants opposed the Engle Class's 1998 motion to add thirteen class representatives, which listed Farnan and Della Vecchia, their arguments focused on the timeliness of the motion and on the fact that adding thirteen new class representatives was unnecessary. The defendants did state that the brief descriptions of the proposed new class representatives that were provided by the plaintiffs did not indicate that "they would be adequate class representatives, whose claims are not time-barred." However, the defendants did not argue that any of the proposed class representatives, including Farnan and Della Vecchia, were not proper members of the class because of the class cut-off date.
[3] The cigarette companies are: R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; Philip Morris Incorporated (Philip Morris U.S.A.); Philip Morris Companies, Inc.; Lorillard Tobacco Company; Lorillard, Inc.; Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company; Liggett Group Inc.; Brooke Group Holding Inc., and Dosal Tobacco Corp. The industry organizations are The Council for Tobacco Research-U.S.A., Inc., and The Tobacco Institute, Inc.
[4] The Phase I findings were: (1) that cigarettes cause some of the diseases at issue; (2) that nicotine is addictive; (3) that the defendants placed cigarettes on the market that were defective and unreasonably dangerous; (4) that the defendants made a false or misleading statement of material fact with the intention of misleading smokers; (4)(a) that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both; (5) that all of the defendants agreed to misrepresent information relating to the health effects of cigarettes or the addictive nature of cigarettes with the intention that smokers and the public would rely on this information to their detriment; (5)(a) that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment; (6) that all of the defendants sold or supplied cigarettes that were defective; (7) that all of the defendants sold or supplied cigarettes that at the time of the sale or supply did not conform to representations of fact made by the defendants; (8) that all of the defendants were negligent; (9) that all of the defendants engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold or supplied to Florida smokers with the intent to inflict severe emotional distress; and (10) that all of the defendants' conduct rose to a level that would permit an award of punitive damages.
[5] The named plaintiffs in the State's suit were: The State of Florida; Lawton Chiles, Jr., Individually and as Governor; the Department of Business and Professional Regulation; the Agency for Health Care Administration; and the Department of Legal Affairs.

The named defendants in the State's suit were: The American Tobacco Company; R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; B.A.T. Industries, PLC; Batus Holdings, Inc.; Brown & Williamson Tobacco Corporation; Philip Morris Companies, Inc.; Philip Morris Incorporated (Philip Morris U.S.A.); Loews Corporation; Lorillard Tobacco Company; United States Tobacco Company; UST Inc.; The Council for Tobacco Research-U.S.A. Inc. (successor to Tobacco Institute Research Committee); The Tobacco Institute, Inc.; Hill & Knowlton, Inc.; British American Tobacco Co., Ltd.; and Dosal Tobacco Corp., Inc.
[6] Specifically, count four contained allegations that the defendants violated the Florida Drug and Cosmetic Act, statutory provisions prohibiting the wrongful targeting of minors, statutory provisions prohibiting fraudulent practices, statutory provisions prohibiting public nuisances, and the Florida Deceptive and Unfair Trade Practices Act.
[7] The State's only claim for punitive damages arose from the alleged violation of this Florida statutory provision prohibiting misleading advertising. None of the other statutory provisions alleged to be violated by the FSA Defendants in count four of the State's complaint allowed the recovery of punitive damages.
[8] We also conclude that the punitive damages award was clearly excessive under the limitation based on ability to pay established by our precedent because it is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Lassiter, 349 So.2d at 627. A comparison of the amounts awarded and the financial worth assigned to each company by the Engle Class's expert clearly demonstrates that the award would result in an unlawful crippling of the defendant companies.
[9] See, e.g., Barnes v. American Tobacco Co., 161 F.3d 127 (3d Cir.1998) (affirming district court's decertification); Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir.1996) (reversing class certification on interlocutory appeal); Estate of Mahoney v. R.J. Reynolds Tobacco Co., 204 F.R.D. 150 (S.D.Iowa 2001) (denying motion to certify class action); Badillo v. American Tobacco Co., 202 F.R.D. 261 (D.Nev.2001) (denying motions to certify class action); Guillory v. American Tobacco Co., No. 97 C 8641, 2001 WL 290603 (N.D.Ill. Mar.20, 2001) (denying motion to certify class action); Aksamit v. Brown & Williamson Tobacco Corp., No. C.A. 6:XX-XXXX-XX, 2001 WL 1809378 at *9 (D.S.C. Dec.29, 2000) (denying a motion to certify class action); Thompson v. American Tobacco Co., Inc., 189 F.R.D. 544 (D.Minn.1999) (denying motion to certify class action); Insolia v. Philip Morris Inc., 186 F.R.D. 535, 546 (W.D.Wis.1998) (denying motion to certify class action); Emig v. American Tobacco Co., 184 F.R.D. 379, 389 (D.Kan. 1998) (denying motion to certify class action); Barreras Ruiz v. American Tobacco Co., 180 F.R.D. 194, 197 (D.P.R.1998) (denying motion to certify class action); Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 94 (W.D.Mo.1997) (denying motion to certify class action); Philip Morris, Inc. v. Angeletti, 358 Md. 689, 752 A.2d 200 (2000) (reversing trial court's class certification after trial plan had been established but before trial commenced).
[10] Federal rule 23(b)(3) is similar to Florida rule 1.220(b)(3) and provides in pertinent part that "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition . . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."
[11] But see Castano v. American Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir.1996) (concluding that the interaction of (b)(3) and (c)(4) requires that "a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial"). Both the Second and Fourth Circuits have noted the conflict on this issue. See Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 444 (4th Cir.2003) ("[T]here is a circuit conflict as to whether predominance must be shown with respect to an entire cause of action, or merely with respect to a specific issue, in order to invoke (c)(4)."); Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 167 n. 12 (2d Cir. 2001) (noting that "an alternate understanding of the interaction of (b)(3) and (c)(4) to that set forth in Castano has been advanced elsewhere").
[12] Justice Wells asserts that allowing limited Phase I findings to stand sets "harmful and confusing precedent." Concurring in part and dissenting in part op. at 1284. However, the procedural posture of this case is unique and unlikely to be repeated. Further, many of the questions posed by Justice Wells are answered in this opinion. As we state in both the opening and closing of the opinion, class members (i.e. those individuals who fit the class description as of the November 21, 1996, cut-off date) must file individual actions against the defendants within one year of the issuance of this Court's mandate to benefit from the Phase I finding we uphold herein.
[13] When this Court has interpreted article I, section 22 of the Florida Constitution, it found guidance in the Seventh Amendment of the United States Constitution while recognizing that the Seventh Amendment does not apply to actions brought in state court. See Dep't of Revenue v. The Printing House, 644 So.2d 498, 500 (Fla.1994).
[14] This Court has recognized:

Harmfulness in this context also carries a requirement that the comments be so highly prejudicial and of such collective impact as to gravely impair a fair consideration and determination of the case by the jury. Passing remarks of little consequence in the scope of a lengthy trial should find little sympathy if no contemporaneous objection is voiced. The extensiveness of the objectionable material is a factor to be considered in the harmfulness analysis.
Murphy, 766 So.2d at 1029-30.
[15] There is no record of how many, if any, unnamed individuals relied upon being members of the class and thus did not file an independent action. I conclude that the latest date that this class could have closed was November 21, 1996, so that individuals would have to have claims which were not barred on that date. To avoid barring any of those individuals who did in good faith rely upon being members of the class, I would order that the statute of limitations can be avoided for those individuals or claims filed for one year from the date of our decision becoming final. An individual would have to plead and prove the avoidance as a reply to a statute of limitation affirmative defense pursuant to Florida Rule of Civil Procedure 1.100(a). I believe that this procedure would conform to what this Court allowed in Lance v. Wade, 457 So.2d 1008 (Fla.1984).
[16] Barnes was decided, and thus this footnote was written, before the Maryland Court of Appeals (Maryland's court of last resort) held that the class action in the Maryland case cited was not proper and decertified the class in Philip Morris v. Angeletti, 358 Md. 689, 752 A.2d 200 (2000).
[17] See Susan E. Kearns, Decertification of Statewide Tobacco Class Actions, 74 N.Y.U. L.Rev. 1336 (1999).
[18] See William Dodds, Trial Plans Come to Class Action Arena, 226 N.Y. Law J. (Aug. 13, 2001) at 2:

Faced with actions that seek to aggregate claims of increasingly broad and disparate groups of plaintiffs, many courts across the country now require that plaintiffs, and sometimes both parties, prepare detailed trial plans at the time of or in advance of class certification. For example, in In re Ford Motor Company Vehicle Paint Litigation, 182 F.R.D. 214, 224 (E.D.La.1998), the district court required the plaintiff to submit a trial plan, saying it was constrained from "certifying a class now and worrying about how to try it later." Similarly, in Southwestern Refining Co., Inc. v. Bernal, 22 S.W.3d 425, 435 (Tex.2000), the Texas Supreme Court declared that "it is improper to certify a class without knowing how the claims can and will likely be tried," requiring plaintiffs to submit trial plans prior to certification.
[19] 46 U.S.C. § 688 (1988).
[20] The majority held that the Third District was correct that the judgments against Liggett and Brooke should be reversed on other grounds. I agree.