# Third District Court of Appeal

## State of Florida

Opinion filed December 16, 2020.

_____

No. 3D18-0958
Lower Tribunal No. 12-29000
_____

**Joyce Hardin, etc.,**

Appellant/Cross-Appellee,

vs.

**R.J. Reynolds Tobacco Company,**

Appellee/Cross-Appellant,

An Appeal from the Circuit Court for Miami-Dade County, Spencer Eig, Judge.

The Ferraro Law Firm, P.A., and Allan B. Kaiser, and Dick M. Ortega, and Juan P. Bauta, II, for appellant/cross-appellee.

King & Spalding, LLP, and Scott Michael Edson (Washington, DC), and William L. Durham, II (Atlanta, GA), for appellee/cross-appellant.

Before LINDSEY, HENDON, and GORDO,[1] JJ.

_____

[1] Judge Gordo did not participate in oral argument.

LINDSEY, J.

ON MOTION FOR REHEARING

We treat Appellant's motion for rehearing as a motion for clarification. We grant said motion, withdraw our previously issued opinion, and substitute the following in its place.

This is the second appeal before this Court in this Engle progeny case. Appellant/Cross-Appellee Joyce Hardin appeals from an order granting a directed verdict on her punitive damages claims in favor of Appellee/Cross-Appellant R.J. Reynolds Tobacco Company due to insufficient evidence. Because Ms. Hardin failed to present legally sufficient evidence that R.J. Reynolds's misconduct was related to her product liability claims and was a substantial cause of Thomas Hardin's COPD and death, we affirm.[2]

## I.    BACKGROUND

In December 2007, Thomas B. Hardin commenced an Engle progeny personal injury action to recover damages for contracting COPD/emphysema[3] after smoking

---

[2] In its cross-appeal, R.J. Reynolds argues that should this Court reverse the directed verdict, R.J. Reynolds would, in the alternative, be entitled to a directed verdict pursuant to the post-1999 version of section 768.73(2), Florida Statutes. Because we affirm the main appeal, we need not address the alternative ground for affirmance raised in R.J. Reynolds's cross-appeal.

[3] The parties use COPD (chronic obstructive pulmonary disease) and emphysema interchangeably.

cigarettes manufactured by R.J. Reynolds, American Tobacco Company, and Brown & Williamson (collectively, the "Reynolds Companies"), all of which are now owned by R.J. Reynolds. Mr. Hardin passed away in February 2012, and his window, Joyce Hardin ("Plaintiff"), filed the underlying wrongful death action asserting non-intentional product liability claims for strict liability and negligence and intentional tort claims for fraud by concealment and conspiracy to commit fraud. Plaintiff later filed a motion to amend to seek punitive damages for her intentional and non-intentional tort claims. The trial court concluded that punitive damages were not recoverable for the non-intentional tort claims and only allowed Plaintiff to seek punitive damages for her intentional tort claims.

Following a three-week trial, the jury returned a verdict in Plaintiff's favor on her strict liability and negligence product liability claims but returned a defense verdict on Plaintiff's intentional tort claims. The jury awarded a total of $776,000 in compensatory damages and apportioned 87% of the fault to Mr. Hardin, based on his own comparative negligence, and 13% to R.J. Reynolds. Accordingly, the trial court entered final judgment for Plaintiff in the amount of $100,800.

Plaintiff timely appealed the trial court's denial of her request to seek punitive damages on her non-intentional product liability claims. Based on the Florida Supreme Court's recently decided decision in <u>Soffer v. R.J. Reynolds Tobacco Company</u>, 106 So. 3d 456 (Fla. 2012), this Court reversed and remanded "for a new

3

trial limited to the issue of punitive damages for Hardin's non-intentional tort claims." Hardin v. R.J. Reynolds Tobacco Co., 208 So. 3d 291, 292 (Fla. 3d DCA 2016).

During the second trial, the primary evidence offered in support of punitive damages was the videotaped deposition testimony of Robert Proctor, Ph.D., a historian and expert on the tobacco industry. Dr. Proctor, who admitted he did not know any details about Mr. Hardin, mainly presented generic evidence of the tobacco industry's knowledge that cigarettes were a cause of lung cancer. And despite this knowledge, the cigarette companies mounted a campaign of mass deception and continued selling their cancer-causing cigarettes. Dr. Proctor also testified that the tobacco companies knew their cigarettes were addictive due to the nicotine and that they made their cigarettes easier to inhale.

Plaintiff also presented thirteen pages of deposition testimony from Mr. Hardin, giving a general outline of his smoking history. Mr. Hardin's testimony was that he initially smoked various cigarette brands based on what was available to him. In 1958, Mr. Hardin began smoking Kool cigarettes, manufactured by Brown & Williamson, which he continued to smoke for over 40 years, until he quit in 2004 or 2005. Mr. Hardin further testified that he started smoking Kools because he liked the taste. When asked if he saw any advertising that prompted him to switch to Kools, Mr. Hardin answered that he could not remember any.

4

At the conclusion of the trial, the court informed the jury that because Mr. Hardin was an Engle class member, the following findings from the Engle class action were read to the first jury:

> 1.     Smoking cigarettes causes chronic obstructive pulmonary disease, or COPD;
>
> 2.     Cigarettes containing nicotine are addictive;
>
> 3.     Defendant R.J. Reynolds Tobacco Company was negligent;
>
> 4.     Defendant R.J. Reynolds Tobacco Company placed cigarettes on the market that were defective or unreasonably dangerous.

See Engle v. Liggett Group, Inc., 945 So. 2d 1246, 1276 (Fla. 2006) (holding that with respect to compensatory damages, the above findings in favor of the Engle Class can stand). Importantly, the trial court explained that "[t]hese findings are not applicable to this case now, but are provided solely for context." See Soffer, 187 So. 3d at 1225 ("[T]he individual progeny plaintiffs are not bound by the prior procedural posture of Engle *when pleading punitive damages . . . .*" (emphasis added)).

The trial court also read four findings made by the first jury in this case, which were "binding" and could "not be denied or questioned.":

> 1. Thomas Hardin was addicted to cigarettes containing nicotine and such addiction was a legal cause of his chronic obstructive pulmonary disease and death.

5

2. Joyce Hardin sustained damages for the loss of her husband, Thomas Hardin's companionship and protection, and for her mental pain and suffering as a result of Thomas Hardin's death. Those damages amounted to $776,000.

[3]. The first jury found that Mr. Hardin was 87 percent at fault for causing his own COPD and death and that R.J. Reynolds was 13 percent at fault for causing Mr. Hardin's COPD and death.

4. The jury further found that Mr. Hardin did not rely, to his detriment, on any statement made by R.J. Reynolds or any other tobacco company.

Crucial to our analysis in this case are the following jury instructions on punitive damages:[4]

> Punitive damages are warranted against R.J. Reynolds if you find by clear and convincing evidence that R.J. Reynolds was guilty of intentional misconduct or gross negligence related to Plaintiff's claims of defective product and negligence, which was a substantial cause of Thomas Hardin's COPD and death.

The court further instructed the jury that it could "not seek to punish R.J. Reynolds for any harm suffered by any individuals other than Thomas B. Hardin." Moreover,

---

[4] Cf. Fla. Stand. Jury Instr. (Civil) PD 1(b)(1) ("**If you find for** (claimant) **and against** (defendant), **and you also find that clear and convincing evidence shows that the conduct of** (defendant) **was a substantial cause of [loss] [injury] [or] [damage] to** (claimant) **and that such conduct warrants punitive damages under the standards I have given you, then in your discretion you may determine punitive damages are warranted against** (defendant)").

"R.J. Reynolds cannot be punished merely for manufacturing, selling, or advertising cigarettes."

The jury ultimately deadlocked, writing the following note during deliberations: "We do not think that we can reach a decision in this case." At this point, R.J. Reynolds renewed several motions for directed verdict, which were initially submitted after Plaintiff rested her case-in-chief. In its motion for directed verdict due to insufficient evidence, R.J. Reynolds argued that Plaintiff had failed to introduce any evidence connecting punishable misconduct to Mr. Hardin. More specifically, R.J. Reynolds argued that Plaintiff had "failed to carry her burden of proving–let alone by clear and convincing evidence–that R.J. Reynolds engaged in sanctionable misconduct that caused Mr. Hardin's COPD and death."

The court delivered an <u>Allen</u> charge to the jury[5] and proceeded to hear extensive arguments on R.J. Reynolds's motion for directed verdict while the jury continued deliberations. R.J. Reynolds asserted that based on the jury instructions, the jury could only award punitive damages for misconduct that was a substantial cause of the harm to Mr. Hardin—specifically COPD—but the generic evidence

---

[5] An <u>Allen</u> charge "allows a jury to continue deliberations even after it has announced its inability to do so, where there is a reasonable basis to believe a verdict is possible, while cautioning jurors that they should not abandon their views just to get a verdict or to accommodate the majority." <u>Thomas v. State</u>, 748 So. 2d 970, 977 (Fla. 1999); <u>see also</u> <u>Allen v. United States</u>, 164 U.S. 492 (1896).

7

presented to the jury was about lung cancer. R.J. Reynolds also argued that there was a lack of evidence concerning the Kool cigarettes that Mr. Hardin smoked for over 40 years. In short, it was R.J. Reynolds's position that although Plaintiff presented evidence of misconduct, there was insufficient evidence connecting the misconduct to Mr. Hardin.

In response, Plaintiff focused on the evidence of misconduct but not on linking that misconduct to Mr. Hardin. For instance, plaintiff argued that it did not matter whether Dr. Proctor said anything about COPD[6] because once it was established that "cigarettes could cause harm, whether it's ringworm or cancer, you have an obligation to tell your consumers that there's a danger in this defective product." Plaintiff also repeatedly argued that "all we have to show" is intentional misconduct. When asked directly by the trial court "[w]hat have you shown that Mr. Hardin and Mrs. Hardin are deserving of punitive damages[,]" counsel for plaintiff answered: "I don't have to show anything other than Mr. Hardin dies from smoking their defective cigarettes. That's it."

---

[6] Although not mentioned at the hearing, Dr. Proctor's hours long testimony did include a few general references to COPD/emphysema. Dr. Proctor explained that beginning in the 1950s, there was a large amount of new scientific evidence released to the public about cigarette smoking and emphysema. And in 1964, a Surgeon General's report on COPD, emphysema, chronic bronchitis received wide media coverage. Dr. Proctor also explained that by the 1960s, the tobacco industry recognized that they were in the nicotine business and an internal goal was to "make a safer cigarette by producing addiction without the unattractive side effects of cancer and emphysema."

After the jury was again unable to come to a decision, the court granted R.J. Reynolds's motion for a directed verdict, finding that "no reasonable jury under the circumstances of this case could find that punitive damages were warranted." Plaintiff moved for rehearing, raising many of the same arguments as before. The trial court conducted a hearing and once more considered the parties' arguments, observing that this is a "test case" about whether "generic normal Engle evidence, with nothing, zero frills attaching it to the plaintiff" is enough to send the case to the jury on punitive damages. Plaintiff again focused on the evidence of misconduct. And R.J. Reynolds again maintained that Plaintiff's evidence of misconduct had nothing to do with Mr. Hardin specifically. The court agreed and denied Plaintiff's motion, stating that "[i]t's hard to imagine a case within Engle that is less favorable for the plaintiff on punitive damages." This timely appeal and cross-appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a trial court's ruling on a motion for directed verdict de novo. See Kopel v. Kopel, 229 So. 3d 812, 819 (Fla. 2017). "[A]n appellate court reviewing the grant of a directed verdict must view the evidence and all inferences of fact in the light most favorable to the nonmoving party , and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party." Banco Espirito Santo Intern., Ltd. v. BDO Intern., B.V.,

9

979 So. 2d 1030, 1032 (Fla. 3d DCA 2008) (quoting Owens v. Publix Supermarkets, Inc., 802 So. 2d 315, 329 (Fla. 2001)); see also De La Torre v. Crete Carrier Corp., 786 So. 2d 1202, 1203 (Fla. 3d DCA 2001) ("A motion for directed verdict should not be granted unless the trial court, after viewing the evidence in the light most favorable to the non-moving party, determines that no reasonable jury could render a verdict for the non-moving party." (quoting Lipsig v. Ramlawi, 760 So. 2d 170, 175 (Fla. 3d DCA 2000))).

## III. ANALYSIS

As an initial matter, we highlight the unique procedural posture in this case. Ordinarily, the same jury would hear the evidence pertaining to both compensatory and punitive damages. In other words, the same jury that awarded compensatory damages would also decide whether the conduct giving rise to compensatory damages was deserving of punishment. But here, due to the fact that the case was remanded for a new trial on the issue of punitive damages following Plaintiff's first appeal, there were two separate juries, each considering the evidence presented during their corresponding trials. Our review of the record is limited to the evidence that was before the second jury on punitive damages.

Plaintiff's primary argument below and on appeal is that there was sufficient evidence for a reasonable jury to find that R.J. Reynolds's misconduct was intentional or grossly negligent. We agree, but this is not in dispute. As R.J.

10

Reynolds freely admitted during the hearing on its motion for directed verdict: "Plaintiff has . . . done a lot to try to show gross negligence or intentional misconduct, and that was their entire case . . . ." But, as R.J. Reynolds went on to explain, the issue is whether Plaintiff presented sufficient evidence "to connect that misconduct to the underlying claims that specifically caused harm to Mr. Hardin."

The jury instructions below required Plaintiff to present evidence not only that R.J. Reynolds was guilty of intentional misconduct or gross negligence, but also that such misconduct or gross negligence was *related to Plaintiff's product liability claims* and *was a substantial cause of Mr. Hardin's COPD and death*. This is consistent with the Engle caselaw, which requires an individualized determination with respect to punitive damages. See Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 424 (Fla. 2013) (explaining that in Engle, the Florida Supreme Court "reversed the class-wide punitive damages award as premature because, though the Phase I jury decided the Engle defendants' common liability to the class under certain claims, it did not decide the plaintiff-specific elements of those claims and, therefore, 'did *not* determine whether the defendants were liable to anyone'" (quoting Engle, 945 So. 2d at 1262-63)).

Plaintiff failed to put forth sufficient evidence to satisfy the language requiring a link between R.J. Reynolds's misconduct and Plaintiff's claims and Mr. Hardin's injuries. Plaintiff repeatedly argues there was sufficient evidence that R.J.

11

Reynolds's misconduct was "intentional" or "grossly negligent" within the meaning of section 768.72, Florida Statutes. While this may be true, what is lacking here is sufficient evidence establishing that this misconduct was related to Plaintiff's claims and a substantial cause of Mr. Hardin's COPD and death. The only evidence offered on this issue was Dr. Proctor's testimony, which as set forth below, is insufficient. Pursuant to section 768.72(2), "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Notably absent from section 768.72, however, is the language at issue in this case requiring that the misconduct be related to Plaintiff's claims and a substantial cause of Mr. Hardin's COPD and death.

Based on our careful review of the record, we conclude that Plaintiff failed to present sufficient evidence such that a reasonable jury could find that R.J. Reynolds's misconduct was related to Plaintiff's claims and was a substantial cause of his COPD and death. Plaintiff's key witness, Dr. Proctor, testified that he knew nothing about Mr. Hardin and that his expert testimony was not specific to any particular smoker:

> Q. Dr. Proctor, in preparation for your testimony in this case, have you read any depositions of family members of Thomas Hardin, the decedent?
>
> A. No.

Q. Did you read Thomas Hardin's deposition that was taken before his death?

A. No.

Q. Have you reviewed any medical records in this case?

A. No.

Q. Have you reviewed any expert witness depositions in this case?

A. No.

Q. Have you talked to any of Plaintiff's experts?

A. No.

Q. Have you talked to any family members of Thomas Hardin?

A. No.

. . . .

Q. Do you believe that your preparation for this case is lacking in any way to testify as an expert in this case?

A. No.

Q. Can you explain that?

A. Well, I'm not an expert on the Hardin family. I am an expert on the history of cigarettes, cigarette design, cigarette industry conduct or misconduct. I am a historian in the sense of what happened to everyone, not what happened to one individual family.

13

Q. Presently, as an expert in Engle progeny cases, do you offer testimony specific to any particular smoker at any time?

A. No.

Consistent with his answers above, Dr. Proctor gave generic testimony about the tobacco industry's misconduct, mostly as it related to lung cancer and the industry's campaign of mass deception. Dr. Proctor never testified that R.J. Reynolds's misconduct was a substantial cause of Mr. Hardin's COPD or death.

Similar to what was argued below, Plaintiff claims "that the *specific* lung disease Mr. Hardin contracted was immaterial, since the evidence showed that the Reynolds Companies had knowledge that their products contained deadly defects that caused lung disease, and despite this knowledge, chose to continue selling them without correcting those defects." This position fails to establish what is required by the jury instructions—evidence not simply of misconduct but of misconduct "related to Plaintiff's claims of defective product and negligence, which was a substantial cause of Thomas Hardin's COPD and death."

Plaintiff cites a handful of cases in which findings of punitive damages were affirmed on appeal where she claims the evidence "was nearly identical" to the evidence presented below: Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483 (Fla. 1999); R.J. Reynolds Tobacco Co. v. Townsend, 90 So. 3d 307 (Fla. 1st DCA 2012); R.J. Reynolds Tobacco Co. v. Martin, 53 So. 3d 1060 (Fla. 1st DCA

14

2010). Plaintiff also cites the following two cases as supplemental authority: R.J. Reynolds Tobacco Co. v. Ledo, 274 So. 3d 416 (Fla. 3d DCA 2019); Cote v. Philip Morris USA, Inc., 400 F. Supp. 3d 1295 (M.D. Fla. 2019).

We are not persuaded that these cases are applicable under the unique circumstances present here. The juries that awarded compensatory damages in those cases were the same juries that determined entitlement to punitive damages. In each case, the jury first determined the tortious conduct that harmed the plaintiff and then decided whether that conduct warranted punishment. Unlike here, the juries were not merely presented with generic evidence of misconduct. For instance, in Ballard, a product liability action involving Kaylo, a carcinogenic, asbestos-containing product, the jury first determined that the defendant manufacturer was negligent and strictly liable for selling Kaylo. The same jury then determined that the plaintiff was entitled to punitive damages based on evidence showing defendant "knew of the deleterious health risks associated with Kaylo for decades, yet consciously made a purely economic decision not to warn its consumers, change its process, remove the asbestos, and/or replace the fibers with readily available, asbestos-free fibers. As a result of this conduct, [defendant] was exposed to Kaylo at several job sites and developed terminal lung cancer." Owens-Corning Fiberglas Corp. v. Ballard, 739 So. 2d 603, 607 (Fla. 4th DCA 1998), approved, 749 So. 2d 483 (Fla. 1999).

15

Moreover, none of the cases cited has any discussion on jury instructions similar to the instructions in this case. But even if there were such a discussion, it is clear that in these cases there was a direct link between the intentional wrongdoing by the defendant and the specific injuries to the plaintiff. In Cote, for example, the jury returned a verdict in favor the plaintiff on each of her theories of liability and further found that the plaintiff was entitled to punitive damages for her intentional tort claims (fraudulent concealment and conspiracy to conceal). 400 F. Supp. 3d at 1301. The court denied Philip Morris's motion for judgment as a matter of law on the punitive damages claim because there was "ample independent evidence showing that Phillip Morris engaged in intentional misconduct." Id. at 1313. The court then gave several specific examples of the evidence of misconduct "*and how it related to [plaintiff.]*" Id. at 1313-14 (emphasis added).

Similarly, Townsend and Martin also involved extensive evidence that smokers had determinately relied on fraudulent statements and that the misconduct associated with that fraudulent behavior warranted punitive damages. In other words, the misconduct in those cases was related to the plaintiffs' intentional tort claims. See Townsend, 90 So. 3d at 313 ("The record of this case . . . is replete with evidence of the decades-long, wanton and intentional conduct by RJR in vigorously, persuasively marketing to the public (including young people) a product the company knew was addictive; willfully concealing the serious health hazards posed

16

by cigarette smoking; affirmatively deceiving the public into believing that cigarettes may not be harmful; and refusing to remove certain ingredients in cigarettes (such as nicotine) that the company counted on to sustain sales."); Martin, 53 So. 3d at 1069 (affirming jury's fraud findings and concluding that "the record contains abundant evidence from which the jury could infer Mr. Martin's reliance on pervasive misleading advertising campaigns").

Here, by contrast, the first jury returned a defense verdict on Plaintiff's intentional tort claims, and the second jury was bound by the first jury's finding that Mr. Hardin did not rely on any statement made by R.J. Reynolds or any other tobacco company. Consequently, although Dr. Proctor presented similar evidence that tobacco companies engaged in a campaign of mass deception and fraud, this generic evidence of misconduct was not related to Plaintiff's surviving claims, which were product liability claims and not intentional tort claims.

## IV. CONCLUSION

Because Plaintiff failed to present sufficient evidence that R.J. Reynolds was engaged in misconduct that was related to her product liability claims and that was a substantial cause of Mr. Hardin's COPD and death, we affirm the trial court's order granting a directed verdict in favor of R.J. Reynolds due to insufficient evidence.

Affirmed.

17