# Third District Court of Appeal

## State of Florida

Opinion filed December 14, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-1739
Lower Tribunal No. 17-2638
_____

**Philip Morris USA Inc.,**
Appellant,

vs.

**Ruby Holliman, etc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Jose M. Rodriguez, Judge.

Arnold & Porter Kaye Scholer LLP, and Geoffrey J. Michael (Washington, D.C.); Shook, Hardy & Bacon LLP, and Scott A. Chesin (New York, NY), for appellant.

Kelley Uustal, PLC, and Robert W. Kelley and Kimberly Wald (Fort Lauderdale); Bishop & Mills, PLLC and John S. Mills, Courtney Brewer and Jonathan Martin (Tallahassee), for appellee.

Before SCALES, HENDON and LOBREE, JJ.

LOBREE, J.

Philip Morris USA Inc. ("Philip Morris") appeals the trial court's denial of its motions for directed verdict and to set aside the verdict in an Engle-progeny[1] action where the jury found for Ruby Holliman (the "plaintiff"), as personal representative of the estate of her deceased husband, Ulisee Holliman ("Holliman"), on her conspiracy claim. The jury concluded that Holliman reasonably relied to his detriment on a statement or statements made in furtherance of the agreement between Philip Morris and the tobacco companies to conceal or omit material information concerning the health effects and/or addictive nature of smoking cigarettes, and that his reliance was a legal cause of his lung cancer and death. Philip Morris primarily argues that the plaintiff failed to prove that her late husband detrimentally relied on any statements made in furtherance of the conspiracy. For the reasons set forth below, we decline to disturb the jury verdict and affirm.

## BACKROUND

The plaintiff commenced the underlying wrongful death action against Philip Morris following her husband's death from lung cancer that she blamed on his smoking of Philip Morris' cigarettes. She asserted claims for strict liability, fraudulent concealment, conspiracy to fraudulently conceal, and

---

[1] Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006).

negligence. The conspiracy claim was based on the tobacco industry's multi-decade efforts, dating back to at least the early 1950s, to deceive and mislead the public about the health risks and addictive nature of cigarettes. The strategy adopted by the industry was to conceal its internal research findings that smoking was addictive and caused cancer and other diseases, deny in public statements that smoking was harmful to health, and refute any scientific evidence suggesting to the contrary. Simultaneously, the industry extensively promoted smoking through its wide-spread advertising. The goal of the industry was not only to target new potential smokers but also to keep existing smokers smoking. Many of the industry's deceptive and misleading press releases, articles, television appearances, and advertisements were introduced into evidence at trial. The conspiracy went on until at least the late 1990s, when the industry first began publicly admitting that smoking is addictive and causes cancer and other diseases, and that there is no such thing as a safe cigarette.

Holliman was born in 1936 and began smoking cigarettes as a teenager. He first smoked R.J. Reynolds Tobacco Company's Salem filtered cigarettes, averaging one-and-a-half packs a day. When he was about twenty-four years old, he switched to Philip Morris' Marlboro Reds, also

filtered cigarettes,[2] and smoked about two packs a day until just after he was diagnosed with stage four lung cancer in early 1993.

No evidence was offered at trial to determine whether the industry's false and misleading statements played any role in Holliman's decision to start smoking. However, there was specific evidence that such statements contributed to Holliman's addiction and continued smoking after he became a regular smoker. Testimony of Holliman's daughter reflected that in the 1980s, while living at home, she used to watch television shows and news programs with her father on which the industry representatives appeared to address the claims that smoking was harmful to health and made assertions to the contrary. Several segments of such programs were introduced into evidence for illustration.[3] The daughter further recalled that after watching

---

[2] Due to the industry's marketing practices, filtered cigarettes were generally perceived as a safer alternative to non-filtered cigarettes, even though they had no real health benefits.

[3] For example, the following video clip was played for the jury:

[THE HOST:] First of all, we know cigarette smoking is bad for our health. Why does The Tobacco Institute continue to promote smoking?

[THE INDUSTRY REPRESENTATIVE:] Well, The Tobacco Institute does not promote smoking. It promotes the right of the individual to make a decision to smoke, and then supports that individual in making that decision.

And I have to disagree with you in that we don't know what causes the illnesses that have been attributed to cigarette

4

one such program in the early 1980s, she had a conversation with her father about smoking. During this conversation, she told him that he needed to stop, as smoking was not good for him, but Holliman maintained that "cigarettes was [sic] not bad for you."[4]

smoking. Certainly, I'm not denying the fact that cigarette smoking could be a risk factor involved with some people and some of the problems that they might have, but I don't think that there is a causal relationship established between cigarette smoking and any disease.

[4] Specifically, the daughter testified as follows:

Q. Did you have conversations with your dad about these programs?
A. Maybe one.
Q. And when you had this conversation with your dad about this program, was he telling you what he was presently thinking in that moment?
A. Yes.
. . . .
Q. What was he telling about these programs - -  about this one program?
A. That cigarettes was [sic] not bad for you.
Q. And this is what he said to you.
A. Yes.

On cross-examination, she elaborated:

Q. You testified that you remember your dad saying something along the lines of, "Cigarettes are good"?
A. Yes.
Q. But you do specifically remember telling him that, "But, look, it says they are not good for you; you need to stop." True?
A. True.
Q. You remember that this was sometime around the mid '80s?

The daughter further testified that these types of programs ultimately made Holliman realize that smoking was, indeed, bad for him, which realization prompted his first attempts to quit. While family members gave somewhat varying testimony as to when the first quit attempts started, the totality of evidence suggested that they were made in the mid-1980s.[5] Around that time, Holliman also received some personal warnings about the health dangers of smoking as some of his family members and co-workers began developing serious health problems from smoking.[6] Holliman made

---

A. Early '80s.

Q. And your testimony is that your dad at that point was saying that the program, whoever it was on that program, was saying that cigarettes were okay?

A. Yes.

Prior to trial, Philip Morris sought to exclude Holliman's out-of-court statement on the basis it was inadmissible hearsay. The trial court ultimately found the statement admissible under the "state of mind" exception to the hearsay rule. See § 90.803(3)(a)(1), Fla. Stat. (2019).

[5] The plaintiff's testimony implied that Holliman made the first attempts in the mid-1980s. Holliman's daughter initially indicated that the attempts started in the early-1980s but later clarified they did not start until the mid-1980s. Holliman's son recalled that Holliman first attempted to quit in the early-1980s by chewing nicotine gum, but expert testimony suggested this was inaccurate, as nicotine gum was not on the market until the mid-1980s.

[6] In the mid-1980s, Holliman's mother developed emphysema from smoking. From the mid-1980s to late 1980s, the plaintiff Ruby Holliman, then a smoker herself, began experiencing health issues caused by smoking and eventually suffered a heart attack. During this timeframe, Holliman's brother-in-law and two co-workers also developed lung cancer because of smoking.

many attempts to quit smoking but did not actually quit until after his lung cancer diagnosis. He died in September 1993, within a year of his diagnosis. He was fifty-seven years old.

The plaintiff's addiction expert opined that Holliman was addicted to nicotine in cigarettes and his addiction was a substantial cause of his continued smoking. Another expert witness, an oncologist, opined that cigarette smoking was a substantial cause of Holliman's lung cancer and death. Further expert testimony generally established that misinforming a smoker of the risks associated with smoking can affect the smoker's motivation to quit smoking and/or to seek expert assistance to be more effective in efforts to quit. Continued smoking, in turn, increases the risk of developing lung cancer and other diseases. An epidemiological study that the jury was apprised of at trial reported that smokers die on average ten years earlier than nonsmokers, as every cigarette smoked takes approximately ten minutes off of a smoker's life expectancy. Smokers who cease smoking before the age of thirty-five have on average the same life expectancy as nonsmokers. On average, smokers who cease smoking before the age of forty-five increase their life expectancy by nine years. Even smoking cessation well into middle-age results in significant health benefits.

Philip Morris' theory of defense was that Holliman smoked because he

enjoyed it and it helped him to manage stress, rather than because he was addicted to nicotine or because of anything the industry said about the health risks and addictive nature of cigarettes, and he had the ability to quit in time to avoid his lung cancer. Philip Morris argued that had Holliman quit smoking early enough (at least before the early 1980s) and continued not to smoke long enough, his risk of getting lung cancer would have reduced dramatically.

The jury returned a verdict in the plaintiff's favor on her negligence, strict liability, and conspiracy claims, and awarded her $2.5 million in compensatory damages. The jury found that punitive damages were warranted, but awarded none. While the jury determined that Holliman was fifty percent responsible for his injuries, the trial court entered judgment on the full amount of the verdict because the plaintiff prevailed on one of her intentional tort claims.[7] After the trial court denied all of Philip Morris' post-trial motions, this appeal followed.

## ANALYSIS

Philip Morris argues that the trial court erred in denying its motions for directed verdict and to set aside the verdict on the plaintiff's conspiracy claim because she adduced insufficient evidence to prove the elements of

---

[7] See Schoeff v. R.J. Reynolds Tobacco Co., 232 So. 3d 294, 305 (Fla. 2017).

detrimental reliance and legal cause.[8]  We review the trial court's denial of a motion for directed verdict de novo.  R.J. Reynolds Tobacco Company v. Rouse, 307 So. 3d 89, 92 (Fla. 3d DCA 2020).  "When an Engle defendant unsuccessfully challenges the sufficiency of the detrimental reliance evidence in the trial court, it can prevail on appeal if no proper view of the evidence or inference from the evidence supports the verdict." Philip Morris USA Inc. v. Cuddihee, 338 So. 3d 444, 446 (Fla. 1st DCA 2022) (citing Whitmire, 260 So. 3d at 538).  We must evaluate the evidence and all reasonable conclusions and inferences from it in the light most favorable to the verdict.  See Rouse, 307 So. 3d at 92.

A claim for conspiracy to fraudulently conceal ordinarily requires a plaintiff plead and prove (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act to further the conspiracy, and (4) damage to the plaintiff because of the acts performed pursuant to the conspiracy. See Rouse, 307 So. 3d at 93.  A district court disagreement over what proof is required to

---

[8] The parties agree that the jury was properly instructed on the reliance element. See R.J. Reynolds Tobacco Co. v. Whitmire, 260 So. 3d 536, 539-40 (Fla. 1st DCA 2018); see also Prentice v. R.J. Reynolds Tobacco Co., 290 So. 3d 963, 965-66 (Fla. 1st DCA 2019), approved, 338 So. 3d 831, 842 (Fla. 2022).

9

prevail on the detrimental reliance element of a conspiracy claim was resolved during the pendency of this appeal in Prentice v. R.J. Reynolds Tobacco Co., 338 So. 3d 831 (Fla. 2022).

Pursuant to Prentice, to prevail on a conspiracy claim, "an Engle progeny plaintiff must prove reliance on a statement that was made by an Engle . . . co-conspirator . . . that concealed or omitted material information about the health effects or addictiveness of smoking cigarettes." Id. at 837. "Actionable misrepresentations are not limited to statements that are affirmatively false on their face" but also include statements that "are misleading because they conceal or omit other material information." Id. at 837-38. In addition, the proof of reliance need not include the exact words of the misrepresentations upon which the smoker relied. See id. (further clarifying that "reliance on 'a statement'" does not require proof of reliance on 'a specific statement'").

The purpose of the reliance requirement is to determine whether the tobacco companies' deceptive messaging influenced the smoker's conduct regarding smoking, such as the smoker's decision to start or continue smoking, or the smoker's failure to quit, to his or her injury. See Prentice, 338 So. 3d at 837 ("[W]hat matters for purposes of reliance is that the plaintiff be able to prove a causal connection running from an Engle defendant's

10

statement or statements, to the [smoker's] beliefs about the health effects or addictiveness of smoking cigarettes, to the [smoker's] injury."); see also Restatement (Second) of Torts § 548, Cmt. a (1977) ("In order to justify recovery, the recipient of a misrepresentation must rely upon the truth of the misrepresentation itself, and his reliance upon its truth must be a substantial factor in inducing him to act or to refrain from action.").

Upon our independent review of the record, we find sufficient evidence to establish that Holliman received, believed, and acted upon false and misleading statements by the tobacco companies regarding the health risks and addictiveness of cigarette smoking to his detriment. When viewed in the light most favorable to the verdict, his daughter's testimony reflected that Holliman saw a number of false and misleading statements about dangers associated with smoking on various television programs once he became a regular smoker, and that he expressed his belief after watching at least one such program that cigarettes were not bad for you.[9] This evidence allowed

---

[9] Holliman's out-of-court statement that "cigarettes was [sic] not bad for you" was admissible because it was offered to show Holliman's material state of mind–his belief that smoking was not bad for him–and not to prove that cigarettes were, indeed, not bad for health. See R.J. Reynolds Tobacco Co. v. Hamilton, 316 So. 3d 338, 341 (Fla. 4th DCA 2021) (finding "the portion of [the deceased smoker's] statement that filtered cigarettes were safe was admissible as that statement was not offered to prove the truth of the matter asserted—that filtered cigarettes were in fact safe—but rather to show [her]

11

for a reasonable conclusion that Holliman continued to smoke because he was misled by the tobacco companies into believing that smoking was not harmful to his health at least until the mid-1980s, when he received the first personal warnings about the risks associated with smoking and made his first attempts to quit. This was sufficient evidence of detrimental reliance. See, e.g. Hamilton, 316 So. 3d at 342 (noting that, if admissible, smoker's statement that filtered cigarettes were safe based on what she heard from advertising was strongest evidence of reliance in case). Moreover, there is a distinction between knowing about general health hazards of smoking and knowing about the danger of addiction associated with it. There is no evidence in the record indicating that Holliman fully comprehended the addictiveness of nicotine during his unsuccessful attempts to quit smoking or at any other time prior to his death.[10]

Because there was evidence from which a reasonable jury could infer that the tobacco companies' false and deceptive messages about the health

then-existing state of mind.").

[10] The fact that Holliman continued smoking after he may have learned of some dangers associated with smoking did not sever the link between the false and misleading statements and his lung cancer and death, because the evidence also reflected that Holliman first learned of the dangers associated with smoking only when his addiction prevented him from successfully quitting.

risks and addictiveness of cigarettes continued Holliman's smoking behavior for a number of years, which, in turn, increased the risk of him developing lung cancer, there was also evidence from which a reasonable jury could infer that Holliman detrimentally relied on Philip Morris' deceptive messaging concerning the health risks and addictive potential of cigarettes, which reliance was a substantial factor in his failure to quit smoking successfully in time to avoid his lung cancer and death. We thus decline to disturb the jury's verdict and affirm.

Affirmed.